[L. A. No. 4954.  In Bank.—October 8, 1919.]

## JOSEPH SCOTT, Respondent, v. TIMES-MIRROR COMPANY (a Corporation), Appellant.

[1] ACTION FOR LIBEL—EVIDENCE—OTHER LIBELOUS ARTICLES—DISSIMILARITY OF IMPORT—APPEAL—REVIEW UNDER GENERAL OBJECTION.—In an action for civil libel, the objection to the admission in evidence of other libelous articles on the ground that they were not of a similar import to and were too remote in time from the article in question is reviewable under the general objection of incompetency, irrelevancy, and immateriality.

[2] ID.—MALICE—WHEN AN ISSUE.—In an action for civil libel, where the plaintiff seeks to recover punitive or exemplary damages, or where the defendant alleges that the publication was justified on the ground that it was privileged, actual malice or malice in fact becomes an issue.

[3] ID.—EVIDENCE—OTHER LIBELOUS ARTICLES—REMOTENESS IN TIME. In an action for libel the remoteness in time of publication of other libelous articles goes to the weight of the evidence only and not to its admissibility.

[4] ID.—EXISTENCE OF MALICE—EVIDENCE.—In an action for libel, it is essentially and purely a question of fact whether the publication of the article was inspired by actual malice, and any evidence which logically tends to solve the question, and which is not otherwise objectionable, is admissible.

[5] ID.—OTHER LIBELOUS ARTICLES OF DISSIMILAR IMPORT—ADMISSIBILITY IN PROOF OF MALICE.—In an action for libel, other libelous articles not of similar import, are admissible for the purpose of proving malice.

[6] ID.—LIBELOUS ARTICLE CONCERNING ATTORNEY AT LAW—DAMAGES—MATTERS FOR CONSIDERATION OF JURY.—In an action for civil libel growing out of an article published in a newspaper concerning an attorney at law, the plaintiff is not required to prove, and in the nature of things cannot prove, the extent to which he has been damaged, or of what legal fees he has been deprived through the circulation of the libel, or what clients he has lost by it, and the jury may consider as a basis for its award of actual damages all of such matters, including the wide publicity given to the libel, plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, and his injured feelings and mental sufferings.

[7] ACTUAL DAMAGES—DISCRETION—APPEAL.—The question of the excessiveness of an award of actual damages is primarily addressed

to the discretion of the trial court, and unless it appears that such award is the result of passion or prejudice, it cannot be disturbed on appeal.

[8] PUNITIVE DAMAGES—DISCRETION OF JURY.—In the matter of punitive damages juries have a wider discretion than they have in the matter of compensatory damages.

[9] MISCONDUCT OF COUNSEL—FAILURE TO REQUEST INSTRUCTION TO DISREGARD—APPEAL—MATTER NOT REVIEWABLE.—Where the action of the trial court is not invoked, alleged misconduct of counsel will not be considered on appeal, if an admonition to the jury would have removed the effect thereof.

[10] LIBEL—CONDUCT OF ATTORNEY IN DIVORCE ACTION—EVIDENCE—ADMISSIBILITY OF COMPLAINT.—In an action for libel growing out of the publication of an article concerning the conduct of an attorney at law in a divorce action in which he represented the wife, the complaint filed by him in such action on behalf of his client was admissible for the purpose of showing the nature and character of the charges made by the wife against her husband under oath; and the fact that such attorney by filing said complaint acted upon the statements made by her.

[11] ID.—ADMISSIBILITY OF BIOGRAPHY OF PLAINTIFF.—In such action for libel there was no error in allowing the plaintiff to give a biographical sketch of himself.

[12] ID.—APPEARANCE OF PLAINTIFF AS OWN ATTORNEY.—In such action it was not error to allow plaintiff, who was represented by another attorney, to appear as his own attorney and to argue the case to the jury.

[13] APPEAL—ERROR IN REFUSING INSTRUCTIONS—WHEN NOT REVIEWABLE.—Alleged error in refusing to give requested instructions will not be considered on appeal where the objections are merely stated without any citation of authority or any argument beyond the bare statement that the court also erred in refusing to give such requested instructions.

APPEAL from a judgment of the Superior Court of Los Angeles County. Pat. R. Parker, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Geo. P. Adams, Joseph L. Lewinsohn, Hunsaker, Britt & Edwards and Samuel Poorman, Jr., for Appellant.

Joseph Scott, John Mason Ross, J. B. Joujon Roche and A. G. Ritter for Respondent.

W. H. Anderson, *Amicus Curiae.*

LAWLOR, J.—This is an action for civil libel growing out of an article published in the "Los Angeles Times," a daily paper owned and controlled by the defendant Times-Mirror Company, of and concerning the plaintiff, an attorney at law in the city of Los Angeles. The case was tried by jury and a total verdict of thirty-seven thousand five hundred dollars rendered, seven thousand five hundred dollars as actual damages and thirty thousand dollars as punitive damages. Judgment for the full amount was made and entered. The defendant interposed a motion for a new trial, which was ordered denied. The defendant appeals from the judgment.

The plaintiff at the time of the alleged libel was, and for more than twenty years prior thereto had been, an attorney at law, practicing his profession principally in the city of Los Angeles. He alleged in his complaint "that on the sixth day of February, 1915, the defendant, through evil motive, and malice, and ill-will toward the plaintiff, willfully, wickedly, wrongfully, maliciously, and with intent and design to injure, disgrace, and defame this plaintiff, and to bring him into public discredit as a lawyer and as a man, and to cause the public to hold said plaintiff in contempt and ridicule, published in said newspaper of and concerning the plaintiff, and of and concerning him in his said capacity and profession, the following false, libelous, malicious, and defamatory article, to wit:

## "THE HILLMAN DIVORCE SUIT.
### "Her Mind's Made Up; They Won't Make Up.

"Having sued her husband for divorce, Mrs. Bessie Olive Hillman returned home, joined her husband in dinner and passed part of the evening with him.

"Having been served with papers in his wife's suit, Clarence D. Hillman conducted himself about the house just as he always had, and as though no little thing like a divorce matter was pending.

"At least, Mrs. Hillman described her domestic situation in about this way. Yesterday she said that while she had brought suit and her husband had been officially informed of the fact, neither of them so much as mentioned the matter and their appetites for dinner were normal.

"In the office of her attorney yesterday Mrs. Hillman regaled a corps of newspaper men with a series of alleged mis-

deeds on the part of her husband for many years. Extreme cruelty last Monday, she said, decided her to get a divorce. It was the culmination of sixteen years of ill-treatment, according to her.

"Thursday afternoon she brought suit; Thursday evening she was very pleasant to her husband, and the same evening she is said to have told newspaper writers that she was not going to press the suit, but would go with her husband to court and dismiss the action. Her husband said the same thing.

"Friday morning she changed her mind; *by noon she was closeted with her attorneys and after luncheon she returned home fully determined to leave her husband forever.* Reports from the Hillman home last evening were that Mr. and Mrs. Hillman enjoyed their well-appointed dinner together, as usual.

"The Hillmans are reputed to be extremely wealthy. They live in an elegant home, and have all the other desirable things of the rich. They have eight children.

"Sued Once Before.

"In 1904 Mrs. Hillman brought suit for divorce, but later dismissed the action. She said yesterday she wished that she had pressed the matter. She says that her husband has a habit of remaining silent at home, only to discuss his domestic affairs through the press. When she sued for divorce before she says that he gave out interviews to the press, using there arguments which he expected to reach and convince her.

" 'This time I am going through with it,' she said yesterday. 'I am tired of his cruelty. All he thinks about is money. He never takes me out anywhere except to church, and that is only for show. After he found out I had brought suit for divorce he was awfully nice to me—but that doesn't make any difference, this time.'

"Joe Scott, who is attorney of record in the case, says he knew nothing about the matter until the suit was filed.

"Son Blames Lawyer.

"Clarence Hillman, the 14-year old son of Mr. and Mrs. Hillman, is endeavoring to patch up matters between his parents, and stated last night at their Pasadena home *that if his mother's attorney would stop meddling he and his father 'could fix things up.'* 'Mother has absolutely no cause

for acting as she has, and we are all heart-broken because of it,' the young son said, 'I am simply sick and can't think of anything since this trouble came up. I can't study and didn't go to school today. We thought everything was all right last night and we all had supper together and mother and father went to mass together this morning, happy as could be, but when he took the smaller children to school, Mr. Scott, her attorney, called her up on the telephone and she went to Los Angeles to see him, and as a consequence came back all wrought up again. Mother can't be right or she'd never do this thing; she is peculiar; she is Irish and when she gets mad she doesn't care for her children or anybody. Her lawyers have been telling her if she'd secure a divorce that she'd get $10,000.00 cash and about $3,000.00 a month spending money. Father gives her everything in the world she could possibly want now. He lets her have from $400.00 to $600.00 every month to spend. *Father and every one of us children are all broken up, but things will adjust themselves in spite of Mr. Scott.'*

## "Won't Be, Says Husband.

"Mr. Hillman said last night that the suit had come to him like a thunderbolt from a clear sky. He said he had no inkling of any trouble, and stated *the whole thing is a conspiracy to ruin him.* He said that since the suit was filed his wife's attorneys had sent men to hang around his place, to find out, he supposes, how much he is worth.

" '*If they would let my wife alone we will fix this thing up,*' he said. 'She is not right; she springs this thing on me every once in a while, but she has always before fallen into the hands of attorneys who would show her the error of her ways. This time it is different, and *her attorney is trying to ruin me and break up our home to fill his own pocket.* But he will not do it; we are going to live and die in this home which we all love so well. Even if my wife should get the $10,000.00 and $3,000.00 a month she would only get it for a short while, for it would break me, as I am heavily in debt, owing several hundred thousand dollars. I have been very busy the last few days, but not one unkind word have I spoken to my wife. I gave her about $500.00 every month and she always keeps four servants and sometimes has six, while I have only one to help me on the outside with this twelve acre estate.'

"The Hillmans won first prize with their electric coupe in the recent tournament of roses parade. The machine was smothered in roses and the youngest child, representing Cupid, rode in a cleverly-arranged seat placed in the front of the coupe. Mr. and Mrs. Hillman and the other children rode in the machine." (Italics ours.)

It is further alleged in the complaint that the defendant "meant to say and was understood to mean" by the portions of the publication which we have italicized "that said plaintiff had persuaded and induced said Bessie Olive Hillman to begin said divorce action, and was urging her to prosecute said action, and to refuse to become reconciled with her husband, for the purpose of breaking up the home of said Bessie Olive Hillman and said Clarence D. Hillman, and of ruining said Clarence D. Hillman, and thereby obtaining the property of said Bessie Olive Hillman and her said husband, or compelling the said Clarence D. Hillman to pay to the plaintiff a large sum of money." After further alleging that the publication was false and defamatory and that "by means thereof the plaintiff has been, and is, greatly injured and prejudiced in his reputation as aforesaid, and has also lost and been deprived of gains and profits which would otherwise have arisen and accrued to him in his said business and profession," and that the publication "was made by the defendant through ill-will and malice toward this plaintiff, and with the intent, design, and purpose on the part of said defendant to injure this plaintiff in his professional standing and reputation, and to discredit and defame this plaintiff, and to bring this plaintiff into public discredit as an attorney at law, and bring him into public contempt and ridicule," the complaint prayed for sixty thousand dollars damages—ten thousand dollars as actual damages and fifty thousand dollars as exemplary or punitive damages.

The defendant's answer, after specifically denying all of the allegations of the complaint, alleged as a separate defense that the article "was privileged, in that the publication of the same was without malice and for the public benefit." And alleged further as a separate defense that the publication was made "without any malice whatever on the part of defendant against plaintiff, and with the belief on the part of defendant that the matter in said article set forth as having

been stated to said reporter by the said Bessie Olive Hillman, her husband and her son was true.''

The issue of actual malice thus having been raised by the pleadings, the plaintiff introduced ten other publications made by the defendant touching the plaintiff, which were admitted in evidence by the court over defendant's objection. The publications so offered and accepted were marked as plaintiff's exhibits 2 to 10, inclusive.

Exhibit 2 was an article concerning the same divorce case and was published in the ''Times'' on the day preceding the publication of the article complained of. Concerning the plaintiff, the following statement of Mr. Hillman appears:

''Unfortunately, it happened that Mrs. Hillman became wrought up while she had access to her lawyer, and he took advantage of her. Had she not been spurred to take some definite action she would not have done such an unnatural thing as to really bring a divorce action.

''There has been no particular reconciliation, for there was need of none. We are just as close as we have ever been, and we shall remain that way, and both Mrs. Hillman and I can assure you that there will never be a divorce in our family, no matter what prying lawyers may do. . . . Mrs. Hillman's suit was filed by Joe Scott.''

Exhibit 3, being the ''Times News Bulletin'' of February 5, 1915, refers to the same matter in the following language:

''Wealthy Seattle-Pasadena man's wife sues for divorce in Los Angeles; he says lawyer took advantage of her.''

Exhibit 4 is an account of the proceedings in the superior court whereby the Hillman divorce case was dismissed and contains the following comments concerning the plaintiff:

''Over Officious.

''Judge Raps Joe Scott; Ends Hillman Divorce.

''A change of mind on the part of Mrs. Bessie Olive Hillman, who brought a divorce suit recently against Charles D. Hillman, a Pasadena millionaire, was sustained yesterday by Judge Monroe and she was freed from her attorney, Joe Scott, who refused to recognize her wishes in the matter. Attorney Scott was left out in the cold in the case and told to collect his fee and other expenses in the case as best he could. . . .

''Mr. and Mrs. Hillman then returned to Pasadena in their limousine. Members of the family said yesterday that now

that the attorney in the case has been eliminated, they expect no further trouble between the father and mother.''

Exhibit 5 is an attack upon the plaintiff's professional conduct in accepting employment as attorney for the McNamaras, charged with blowing up the ''Times'' building. The article appeared in the ''Times'' on August 18, 1912, and, after stating how much money was received from union labor for the defense of the McNamaras, continues:

''How much of it did Job Harriman get? How much of it did Joseph Scott get? You union labor men who pay the piper ought to be told what tunes the piper plays. . . .

''When to the folly of the striker is added dishonest repudiation of his solemn agreement, and the brutality of hounding unfortunate men and women out of house and home, or destroying their lives by dynamite, because they stand up for their liberty to work for their livelihood, the striker is more than a fool—he is a criminal, no matter what Darrow, Harriman, Scott & Co. may say to the contrary. In this connection the disgrace to Los Angeles is that Joseph Scott, of this dynamite-murderer defense trio, is still a member of the Board of Education.''

Exhibit 6, which appeared in the editorial column, is an attack on the plaintiff as a member of the board of education, in opposition to his candidacy for re-election to the board. It appeared in the ''Times'' of April 22, 1913, and reads as follows:

''The School Board.

''Undoubtedly one of the most important issues to be tried out in the primary election of May 6 is the membership of the Board of Education. The Municipal Conference endorsed the present Board—the whole of it for re-election. The Times cannot quite follow it; it cannot assent to the return of Joe Scott, defender of the McNamaras, or of Reynold Blight, who is more or less of an agitating anarchist, if he is anything. These men are not safe guides for youth, not suitable persons to be in charge of our public instruction. The ministerial associations are supporting a ticket of their own which includes one straight-out Socialist nominee, Mr. Wheat. Such a condition of things is beyond our comprehension. Socialism would destroy Christianity; its tenets are as subversive of the Christian foundations as are those of atheism. When a process of mixing crude oil and aqueduct water has been devised

and made clear to the popular mind, somebody may be able to satisfactorily explain how leaders of the Christian church can favor the election of a Harriman ticket Socialist to the School Board.  Still we must admit that a Socialist might be found who would be preferable to Darrow's companion, Joe Scott, or to R. Blight, who is a sort of blighted Clarence Darrow himself.  We are glad that the church people are getting their eyes opened as to his true character.  It is needless to say that the ministerial associations, which are sincerely working in behalf of right influences in the schools, are opposed to Scott and Blight and have left them off their list.''

Exhibit 7 appeared in the ''Times'' on July 23, 1914, and contained the following statements concerning the plaintiff in his position as a member of the board of education:

''The Exposure and Defeat of Joe Scott.

''The master-stroke of the majority members of the Board of Education on Tuesday evening will meet the unqualified approval of every friend of free education.

''In putting a quietus to the unseemly, unjustifiable and destructive squabble, which had been injected into school affairs through the malevolence of Joe Scott, by declaring that, notwithstanding the trumpeted publicity given so-called 'charges' against Superintendent of Schools Francis, they find no charges have been made and properly term them mere 'objections.' . . . To logically complete the miserable incident, but one more step is demanded—the resignation of Scott from the board he has disgraced.

''What a sorry spectacle this self-appointed censor has made of himself in his efforts to control the education of 70,000 children, under a system lauded by educators as the best in the country, but with which he is entirely out of harmony.  For years he has treated with disrespect his colleagues on the board by seeking to do things behind their backs, the while professing solicitude for the public schools.  He has made life miserable for them behind closed doors and upbraided them in open session, all of which they have borne with a fair degree of humility in order to avoid clashes with the 'temperamentally unfit' member.

''Scott has been the steadfast objector to everything that failed to meet his approval, and has sought by technical delays and in other ways to circumvent the will of the majority; he has been the consistent fosterer of strife, but has conducted

CLXXXI Cal.—23

his activities so insidiously that the public has been slow to learn the truth; by his attitude toward the superintendent, whose functions he sought to usurp in many ways, he has encouraged insubordination and sneaking tactics, and is believed to have coached an under-official in an effort to discredit the superintendent; by his openly declared opposition to the intermediate schools, he has been the actual force behind the agitation of a coterie to destroy their efficiency.

"What right has a man of this sort to be a member of the Board of Education? Why did he wish to retain his place on the teachers and schools committee? His offer at Tuesday night's meeting, to gamble for the place, sets a sorry example to school children; and its prompt repudiation by President Frank was a deserved rebuke."

Exhibit 8 is an article published in the "Times" on February 14, 1915, after the publication of the alleged libel, and was in reference to a libel suit or suits brought by the plaintiff against the defendant. It contains the following remarks concerning plaintiff:

"Joe Scott's Fool Raids.

"Uneasy, not to say luckless, Joe Scott (once a McNamara attorney of the retiring sort), recently gave mental birth to the curious conceit that The Times was indebted to him in the sum of $60,000.00 for publishing an alleged libel upon himself; . . . Joe Scott would do well to cease pursuing a delusive ignis fatuus; he might better try to get relief from his jejune, jagged and jeopardized plight by trying, even hopelessly, to earn the requisite ducats by practicing that profession in which he has never shone with the resplendent glory of the noonday sun. . . . Joe Scott—huh."

Exhibit 9 is a cartoon published in the "Times" on March 1, 1915, and entitled "Nothing but Holes." It presents a large hoop covered with paper which is full of holes and across which is written "Joe Scott's Complaint in the L. A. Investment Co. Case." A man bearing in his hand a roll of paper on which appears "Court's Decision" is seen standing on the backs of two horses which are in the act of jumping through the center of the hoop.

On December 5, 1915, plaintiff's exhibit 10 was published in the editorial columns of the "Times." It reads in part as follows:

"What a Monster!

"The Times is not, as was represented by Joe Scott and his Arizona attorney, Ross, in their arguments before the jury in both trials of Scott's libel suit against the Times-Mirror Company, a gigantic newspaper Minotaur, hiding in the Cretan labyrinth or fort-like structure at the corner of First and Broadway—a monster pulling into its relentless maw not only youths and maidens, but also full-grown alleged lawyers who exploit divorce suits, and progressive politicians and other vermin, and who

> "'Be they alive or be they dead,
> Grinds their bones to make its bread.'

"When examined in the true light of the actual facts of its long and open journalistic career, how different is the attitude, standing and character of the Los Angeles Times from the untrue and unsupported representations made by Joe Scott and his man Ross in two conspicuous Superior Court cases, when these special pleaders were suffered to do their worst in their demagogic efforts to conceal the truth and poison the minds of the juries against the Times and against its actual motives, course, career and journalistic record!

"It was a reckless and a desperate effort to make the jury believe something besides the truth and to bring in a verdict not in harmony with the facts and the merits of the case at issue—an effort that brought the plaintiff to the very ragged edge of failure."

All of these publications were admitted for the limited purpose of proving malice in fact.  The offer of plaintiff was so limited, and the court, by its instructions, specifically confined the jury to a consideration of the articles in so far as they might be deemed evidence of malice in fact, and repeatedly advised the jury that they were "not to consider the truth or falsity of them, as the truth or falsity of said articles is not in issue in this case"; and that no award of actual damages could be based in whole or in part upon any of the publications admitted in evidence excepting the one sued upon.

The transcript on appeal shows that a large number of exceptions were reserved at the trial, but the only points urged in appellant's briefs are as follows:

"I.   The court erred in admitting libelous articles not of similar import and remote in time.

"II.   The verdict is so grossly excessive that it shocks the conscience because: (a) The award of seven thousand five hundred dollars actual damages is not supported by the evidence; (b) the evidence does not show malice on the part of the corporation in making the publication; or, if malice be shown, it is totally disproportionate to the award.

"III.   The plaintiff, acting as his own counsel, was guilty of misconduct constituting prejudicial error.               -

"IV.   Other errors in the admission of evidence.

"V.   The court erred in allowing plaintiff, who was represented by an attorney at law, to appear as his own attorney; and in permitting him to argue the case to the jury.

"VI.   The court erred in refusing to give instructions 2 and 3 requested by the defendant."

Appellant does not criticise any of the instructions given by the court.   But it is contended that the admission in evidence of plaintiff's exhibits 5–10, inclusive, the relevant portions of which we have set out above, constituted reversible error because the articles are "not of similar import" to, and are too "remote in time" from the publication set out in the complaint.   To which respondent replies that "the objection here urged was not made in the trial court, and for that reason is not entitled to consideration in this court."   At the trial the defendant objected to the admission in evidence of all of the other publications, but the defendant does not claim that exhibits 2, 3, and 4 were improperly admitted, the only assignment of error in that behalf being as to the admission in evidence of exhibits 5–10, inclusive.   We will therefore confine our discussion in this regard to a consideration of the sufficiency of the objections as made to reserve the specific objection that the articles admitted in evidence were "not of a similar import" to, and were too "remote in time" from the one complained of.

The record shows that exhibit 5 was objected to on the ground that it was "incompetent, irrelevant, and immaterial."   Exhibit 6 was similarly objected to and upon the additional ground that it was a privileged communication— a criticism of the plaintiff as a public official.   Identically the same objection was made to exhibit 7 as to exhibit 6.   To

exhibit 8 it was objected that "it was incompetent, irrelevant, and immaterial, and of a date subsequent to the date of the article upon which this action was brought." Exhibit 9 was objected to on the ground that it was "incompetent, irrelevant, and immaterial; being a publication subsequent to the publication of the article on which this action was brought, and having no reference to it in any way whatsoever, and not responsive to any of the issues of the case." To the introduction of exhibit 10 objection was made that it was "incompetent, irrelevant, and immaterial, and that it was a publication made approximately ten months after the publication upon which the action was brought."

While the point as to remoteness of time was included in some of the objections, it is apparent from the foregoing that the specific objection as to dissimilarity of subject matter now urged was not in terms made at the trial. **[1]** We think, however, that the general objection of incompetency, irrelevancy, and immateriality which was made in each instance was sufficient to reserve for review the specific point of "dissimilarity of import." It has been held that the general objection, if properly made, is sufficient in all cases in which the specific grounds of objection, if stated, could not be obviated. In *Nightingale* v. *Scannell,* 18 Cal. 315, it was said, referring to *Merritt* v. *Seaman,* 2 Seld. (6 N. Y.) 168: "A general objection had been taken to the introduction of evidence, and it was held that, as the difficulty could not be obviated, such an objection was all that was necessary. The same point precisely is presented in this case, and we think there is nothing in reason or propriety calling for a different determination. The evidence, say the defendants, was not admissible for any purpose; and if that be correct, the difficulty could not have been obviated, and the objection was sufficient." (See, also, *Brumley* v. *Flint,* 87 Cal. 471, [25 Pac. 683]; *Wise* v. *Wakefield,* 118 Cal. 107, [50 Pac. 310].)

I.

Appellant urges that the court erred in admitting libelous articles not similar in import to the one sued upon for the reason that "such evidence, if admitted, would lead to the investigation of collateral issues to the confusion of the jury, would take the defendant by unfair surprise, and would unjustly enhance the damages by leading to double or multiple

damages, according to the number of libels received in evidence.''

[2]   It is well established that in actions for civil libel where the plaintiff seeks to recover punitive or exemplary damages, or where the defendant alleges that the publication was justified on the ground that it was privileged, actual malice or malice in fact becomes an issue. As we have pointed out, the issue of actual malice was raised in this case both by the demand of the plaintiff for punitive damages and by the allegation of the defendant that the publication was privileged. ''The record thus presents the question,'' to quote from appellant's brief, ''whether or no express malice on the part of the defendant in publishing an article on February 6, 1915, reporting that plaintiff had been charged with improper conduct in a divorce case, can be shown by introducing other articles, remote in time, that charge insincerity and hypocrisy in the acceptance of a retainer to defend a group of labor union dynamiters, malevolence and hypocrisy in the course pursued by him as a member of the board of education; and pettifogging arguments made to the jury in other cases against this defendant, and also charge incompetence in the 'L. A. Investment Case.' Or, in other words, in order to show malice in fact, are libels, other than the one complained of and not of similar import and published at remote times, competent, material or relevant?'' Appellant continues: ''The question is not difficult of answer, because it is settled by authority, both in this jurisdiction and in practically all other jurisdictions, that *while libels of similar import are admissible,* because they tend to show that the publication in suit was deliberately made, yet *libels not of similar import are not admissible,* and remoteness of time of publication only adds to the vice of such evidence.''

[3]   It is proper at this time to point out that ''remoteness in time of publication'' goes to the weight of the evidence only and not to its admissibility. (Wigmore on Evidence, par. 404; *Evening Journal Assn.* v. *McDermott,* 44 N. J. L. 430, [43 Am. Rep. 392]; *Gribble* v. *Pioneer Press Co.,* 34 Minn. 342, [25 N. W. 710]; *Julian* v. *Kansas City Star Co.,* 209 Mo. 35, [107 S. W. 496].) This, apparently, has been accepted by counsel for appellant as the law on this point,

for it is said in their reply brief: "This point, being unimportant, will not be further noticed."

In support of the contention that *"libels not of similar import are not admissible,"* appellant has cited the following cases from this jurisdiction: *Chamberlain* v. *Vance,* 51 Cal. 75; *Stern* v. *Lowenthal,* 77 Cal. 340, [19 Pac. 579]; *Harris* v. *Zanone,* 93 Cal. 59, [28 Pac. 845]; *Westerfield* v. *Scripps,* 119 Cal. 607, [51 Pac. 958]; *Hearne* v. *De Young,* 119 Cal. 670, [52 Pac. 150, 449]. Of these appellant relies chiefly on *Stern* v. *Lowenthal.* The action there was for slander. The slander complained of consisted of two statements: "He is a thief," and "He is doing business on my money." The trial court had admitted in evidence and refused to strike out another statement made by defendant "that he would break Mr. Stern [plaintiff] up in business." On this point it was said: "Upon that question the opinions of courts have been discordant. Against the admissibility of such evidence, the opinion of Bronson, J., in *Root* v. *Lowndes,* 6 Hill (N. Y.), 518, [41 Am. Dec. 762], is characteristically clear and vigorous. Townshend, after referring to some conflicting opinions upon this point, says: 'But the better opinion appears to be that evidence of a charge of a *different* nature, and at a different time from that alleged in the declaration, is inadmissible to prove malice, *or for any purpose.* This is in effect only another form of the rule that actionable words not counted upon cannot be given in evidence unless suit upon them is barred by the statute of limitations, and their admission where the statute has run is opposed to principle, as it, in effect, restores a cause of action which has been taken away by the law.' (Townshend on Libel and Slander, sec. 392.) In that view of the question we concur, and think the court erred in denying the motion of the defendant to strike out."

The Lowenthal case was heard in Bank. However, only four justices participated in the decision, and only three of these concurred on this point. Chief Justice Searls concurred on one point only, and expressly reserved opinion upon the other—the question of alleged error in the admission of other slanderous statements. Since the concurrence of four members of the court is necessary to a decision in Bank (Const., art. VI, sec. 2; *Del Mar Water etc. Co.* v. *Eshleman,* 167 Cal. 666, [140 Pac. 591, 948]; *Pacific Wharf etc. Co.* v. *County of Los Angeles,* 180 Cal. 31, [179 Pac. 398]), it is plain that the

language quoted above is not a decision of this court upon the point there considered. Moreover, the case of *Harris* v. *Zanone, supra,* cited by appellant, contains language directly opposed to that relied on in the Lowenthal case. In that case the slander charged was that the defendant had said that the plaintiff was "a damned thief." One of the questions there presented was as to the admissibility, for the purpose of showing malice in fact, of certain threats made by defendant that he would ruin plaintiff's reputation. As affording evidence of malice in fact, we can see no distinction between threats to break plaintiff up in business, the admission of which was said to be error in the Lowenthal case, and threats to ruin plaintiff's reputation, which were held admissible in the Harris case. In deciding the point in the Harris case, the court said: "Evidence was offered in behalf of the plaintiff that the defendant had repeated the defamatory words to others upon different occasions, and there was other evidence before the jury tending to establish the falsity of the charge, *and also that the defendant had expressed a purpose to injure her reputation. If the jury believed this evidence, they were authorized to find therefrom, that the defendant was actuated by express malice* in the utterance of the words of Loheide, and therefore was not entitled to the immunity of a privileged communication." (Italics ours.)

*Chamberlain* v. *Vance, supra,* which was a case where actual malice was sought to be proved, holds that slanderous words of *similar import* spoken of the defendant after the commencement of the action *are* admissible in evidence on the question of malice. The question here involved—the admissibility of words of *"dissimilar import"*—was not before the court in that case and was not there discussed. Likewise *Westerfield* v. *Scripps, supra,* goes no further than to declare that "if language relates to the same subject matter, and is of a character from which a malicious purpose may be inferred, it is admissible." Nor was the point here presented discussed in *Hearne* v. *De Young, supra.* It was there held that the publication objected to was *not* of a different nature from the one sued upon, and that, therefore, it was admissible.

In view of the state of our own decisions it will serve no useful purpose to set out or discuss the numerous authorities from other jurisdictions cited by appellant on this point. Some of them may be distinguished because the statutes under

which the decisions were made are different from ours, and in others no distinction is drawn between implied malice and malice in fact. And in several of the authorities the proof of other publications is received or rejected according to whether they have been barred by the statute of limitations, which is touched upon in the Lowenthal case, the reasoning being that if not so barred the evidence should be rejected, because it would tend to aggravate the damages for the particular libel and at the same time permit in the future a possible recovery for the contributing libel. If this reasoning be sound, it would seem to apply with equal force to all libels, whether similar or dissimilar in import. As we have indicated, the appellant has attempted to differentiate them and argues that articles of similar import are admissible, but that those of dissimilar import are not. But whatever those authorities may decide, or their underlying reasoning may be, they are clearly not binding as authorities in this jurisdiction.

The rule governing the admission of evidence to prove malice in fact has been clearly laid down by this court, speaking through Mr. Justice Henshaw, in the decision of *Davis* v. *Hearst,* 160 Cal. 143, [116 Pac. 530] : ''As to the nature of the evidence, as has been said, it may be direct (or express, as the code names it), going to declarations, acts, and conduct of the defendant, showing personal ill-will toward the plaintiff, but it will more usually be *indirect or inferred* (the implied malice in fact of the code definition), *and to this end of proving the malice inferentially all legitimate evidence is admissible bearing upon the general course of conduct of the defendant toward the plaintiff,* the internal evidence furnished by the character of the libel, and any other specific facts and circumstances not in direct proof of the malice, but from which the existence may be logically inferred, herein including the circumstance, if it be found to exist, of wanton recklessness and heedlessness of plaintiff's rights.'' (Italics ours.)

One of the questions presented by the pleadings is whether the publication of the article of February 6, 1915, was inspired by actual malice. [4] This, is essentially and purely a question of fact. Therefore, any evidence which would logically tend to solve the question, and which is not otherwise objectionable, is admissible. The test to be applied to evidence offered for this purpose is : Does it tend to prove the

state of mind of the party responsible for the publication? If the evidence has such logical import, and is not otherwise incompetent, it must be received, and it is for the triers of the fact to determine the weight to be given to such evidence. The fact that it may also tend to establish the publication of other distinct libels, published either before or after the one constituting the cause of action, is to be regarded as merely incidental and as not furnishing ground for the exclusion of the evidence. Nor is it material that other actions may thus be shown to exist against the party. Hence, where punitive or exemplary damages are sought in an action for civil libel any evidence (which in no other respect is objectionable), having a logical tendency to prove that the publication was prompted by actual malice, is material, competent, and relevant. This is the plain meaning of *Davis* v. *Hearst, supra,* and if there was any question about the state of our law on the subject prior to that decision there is none now. It is inconceivable that since the law provides for recovery upon publications made with actual malice the existence of the fact may not be established by the very best evidence—namely, evidence of other libels tending to show a malicious and vindictive attitude of mind toward the injured party. **[5]** To hold otherwise would be to recognize a right in the party defamed but deny to him a full opportunity to establish and enforce it.

The true rule has been well stated by Odgers and Newell in their respective works on libel and slander:

"1. Extrinsic Evidence of Malice.

"Malice may be proved by extrinsic evidence showing that the defendant bore a long-standing grudge against the plaintiff, that there were former disputes between them, that defendant had formerly been in the plaintiff's employ, and was dismissed for misconduct. Any previous quarrel, rivalry or ill-feeling between plaintiff and defendant—in short, almost everything defendant has ever said or done with reference to the plaintiff—may be urged as evidence of malice. The plaintiff has to show what was in the defendant's mind at the time of the publication, and of that no doubt the defendant's acts and words on that occasion are the best evidence. But if plaintiff can prove that at any other time, before or after, defendant had any ill-feeling against him, that is some evidence that the ill-feeling existed also at the date of publica-

tion; therefore, all defendant's acts and deeds that point to the existence of such ill-feeling at any date are evidence admissible for what they are worth. . . .

"In fact, whenever the state of a person's mind on a particular occasion is in issue, everything that can throw any light on the state of his mind then is admissible, although it happened on some other occasion. . . .

" . . . The more the evidence approaches proof of a systematic practice of libeling or slandering the plaintiff the more convincing it will be." (Odgers on Libel and Slander, 5th ed., pp. 348, 349.)

"Any other words written or spoken by the defendant of the plaintiff, either before or after those sued on, or even after the commencement of the action, are admissible to show the *animus* of the defendant; and for this purpose it makes no difference whether the words tendered in evidence be themselves actionable or not, or whether they be addressed to the same party as the words sued on or to someone else. Such other words need not be connected with or refer to the defamatory matter sued on, provided they in any way tend to show malice in defendant's mind at the time of publication. And not only are such other words admissible in evidence, but also circumstances attending the publication, the mode and extent of their repetition. The more the evidence approaches proof of a systematic practice of libeling or slandering the plaintiff, the more convincing it will be." (Newell on Slander and Libel, 3d ed., p. 405.)

The rule thus expressed is supported by the following cases: *Julian* v. *Kansas City Star Co.,* 209 Mo. 35, [107 S. W. 496]; *Register Newspaper Co.* v. *Worthen,* 33 Ky. Law Rep. 840, [111 S. W. 693]; *Meriwether* v. *Publishers,* 211 Mo. 199, [16 L. R. A. (N. S.) 953, 109 S. W. 750]; *Evening Journal Assn.* v. *McDermott,* 44 N. J. L. 430, [43 Am. Rep. 392]; *Williams Printing Co.* v. *Saunders,* 113 Va. 156, [Ann. Cas. 1913E, 693, 73 S. E. 472]; *Stearns* v. *Cox,* 17 Ohio, 590; *Van Derveer* v. *Sutphin,* 5 Ohio St. 294; *Bottsford* v. *Chase,* 108 Mich. 432, [66 N. W. 325]; *Seip* v. *Deshler,* 170 Pa. St. 334, [32 Atl. 1032]; *Knapp* v. *Fuller,* 55 Vt. 311, [45 Am. Rep. 618]; *Severance* v. *Hilton,* 32 N. H. 289; *Williams* v. *Hicks Printing Co.,* 159 Wis. 90, [150 N. W. 183]; *Downs* v. *Cassidy,* 47 Mont. 471, [Ann. Cas. 1915B, 1155, 133 Pac. 106]; *Smith* v. *Brown,* 97 S. C. 239, [81 S. E. 633]; *Vial* v. *Larson,* 132 Iowa,

208, [109 N. W. 1007]; *Hintz* v. *Graupner*, 138 Ill. 158, [27 N. E. 935]; *Grace* v. *McArthur*, 76 Wis. 641, [45 N. W. 518]; *Casey* v. *Hulgan*, 118 Ind. 590, [21 N. E. 322]; *Beshiers* v. *Allen*, 46 Okl. 331, [L. R. A. 1915E, 413, 148 Pac. 141]; *Brittain* v. *Allen*, 13 N. C. 120.

## II.

Appellant contends that the judgment should be reversed because the "verdict is so grossly excessive that it shocks the conscience because: (a) The award of seven thousand five hundred dollars actual damages is not supported by the evidence; (b) the evidence does not show malice on the part of the corporation in making the publication; or, if malice be shown, it is totally disproportionate to the award." Appellant's position is that there is no evidence whatever presented here justifying the recovery of any damages, either compensatory or punitive. And because respondent did not prove specific pecuniary loss caused by the libel he is not entitled to any compensation whatever. With this position we cannot agree.

The evidence introduced for the purpose of proving damages and upon which the jury made the award tended to show that the publication caused the plaintiff mental anguish. On this point he testified: "I was very indignant. I felt that a great injustice had been done to me, to my office, and to my reputation. I felt it was degrading before my fellow members of the bar and before the community. It hurts yet. I believe it and I know it to be wholly untrue. I would say, so far as the statements of my office were concerned, it reflected on my office." Referring further to plaintiff's testimony it appears: That he was born in England, where he was educated and matriculated in the University of London. That he came to this country while still a young man, and for a time was professor of rhetoric and English literature in a college in Western New York. That he was admitted to practice his profession in this state, and in 1894 opened an office in Los Angeles, where he has been engaged in practice ever since. That he had a general practice, including considerable probate business, trial and jury work, with an occasional criminal case, and only a limited corporation practice. That at the time of the publication of the libel complained of he employed six lawyers and a number of stenographers in his office, his office expenses, including salaries, amounting to about one thousand five hundred dollars a

month, and his gross income about forty thousand dollars a year. That his practice had been built up from a modest beginning, it appearing that when he started he lived and had his office in the same room. That plaintiff's practice extended to the various counties of the state, and to a large extent in Arizona. That he is admitted to practice in the United States supreme court and other federal courts. That plaintiff was married in 1898, and at the time of the trial his family consisted of his wife and seven children. That he commanded the confidence of the people of Los Angeles, having been a member of the board of education in that city continuously from 1904 to 1915, and was five times elected president of the board. That in addition he was for ten years director and in 1910 president of the Los Angeles chamber of commerce; director of the Equitable Savings Bank and of the Los Angeles Investment Company of the same city. That he is a member of several clubs and of the county, state, and American bar associations. That the value of the defendant's property is about two million dollars. That the average daily circulation of the "Los Angeles Times" was about sixty thousand and the Sunday edition about one hundred and two thousand, the paper circulating throughout California and Arizona and elsewhere.

It is alleged in the complaint that "at all times prior to the sixth day of February, 1915, [the plaintiff] did enjoy a good name and reputation as an attorney at law." This allegation not having been denied, the plaintiff's good name and reputation must be presumed.

[6] The respondent is not required to prove, and in the nature of things cannot prove, the extent to which he has been damaged by this libel, or of what legal fees he has been deprived through its circulation, or what clients he has lost because of it. It is well settled that in such cases as this a jury may consider as a basis for its award of actual damages all of such matters as those set out above, including the wide publicity given to the libel, plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, his injured feelings and his mental sufferings. (*Cahill* v. *Murphy*, 94 Cal. 29, [28 Am. St. Rep. 88, 30 Pac. 195]; *Turner* v. *Hearst*, 115 Cal. 395, [47 Pac. 129]; *Davis* v. *Hearst*, 160 Cal. 143, 185, [116 Pac. 530].) Appellant's motion for a new trial was made on the ground, among others, that the award of actual damages was excessive. The motion

was denied. **[7]** The amount of such damages, therefore, stands approved by the trial court and under the well-established rule, the question of the excessiveness of the verdict being primarily addressed to the discretion of the trial court, we cannot disturb it unless it appears that such award is the result of passion or prejudice. In *Swain* v. *Fourteenth St. R. R. Co.,* 93 Cal. 179, [28 Pac. 829], it was said: "The amount of the verdict in this case is large; but we cannot say that it is suggestive of either passion or prejudice on the part of the jury. In fixing damages in this class of cases, which is left to the discretion of the jury, and when the verdict has been approved by the trial court, this court is not authorized to grant a new trial upon the ground of excessive damages, except in a case where it is plain that the verdict was not the result of the fair and honest judgment of the jury." (See, also, *Gomez* v. *Scanlan,* 155 Cal. 528, [102 Pac. 12]; *Dunn* v. *Hearst,* 139 Cal. 239, [73 Pac. 138]; *Aldrich* v. *Palmer,* 24 Cal. 516; *Meyer* v. *Great Western Ins. Co.,* 104 Cal. 381, [38 Pac. 82]; *Hickey* v. *Coschina,* 133 Cal. 81, [65 Pac. 313].) In the latter case it was said: "The court below had the power to, and no doubt did, carefully weigh and consider the evidence for the purpose of determining whether or not the verdict was the correct conclusion from all the testimony in the case. It had the power to set aside the verdict, even though the evidence was not conflicting, if convinced that it was unjust, or not in accord with the weight of the evidence. Here we have no such power. The presumptions are all in favor of the correctness of the verdict. To this presumption is added the sanction of the court below in denying the motion for a new trial."

In *Wilson* v. *Fitch,* 41 Cal. 386, where there was no proof of actual malice, and, as was held by the court, not a case for punitive damages, it was said in answer to the claim that the damages awarded were excessive: "The court will not interfere in such cases, unless the amount awarded is so grossly excessive as to shock the moral sense and raise a reasonable presumption that the jury was under the influence of passion or prejudice. In this case, whilst the sum awarded appears to be much larger than the facts demanded, the amount cannot be said to be so grossly excessive as to be reasonably imputed only to passion or prejudice in the jury. In such cases there is no accurate standard by which to compute the injury,

and the jury must necessarily be left to the exercise of a wide discretion, to be restricted by the court only when the sum awarded is so large that the verdict shocks the moral sense and raises a presumption that it must have proceeded from passion or prejudice."

[8] In the matter of punitive damages it is clear from the authorities that juries have a wider discretion in this regard than they have in the matter of compensatory damages. (*Voltz* v. *Blackmar*, 64 N. Y. 440; *Day* v. *Woodworth*, 13 How. 363, [14 L. Ed. 181, see, also, Rose's U. S. Notes]; *Bennett* v. *Hyde*, 6 Conn. 24; *Hayner* v. *Cowden*, 27 Ohio St. 292, [22 Am. Rep. 303]; *McConnell* v. *Hampton*, 12 Johns. (N. Y.) 234.) In *Luther* v. *Shaw*, 157 Wis. 234, [147 N. W. 18], the court in affirming the award of punitive damages said: "Where the jury are properly given such broad discretion with reference to exemplary damages, as indicated by the code of instructions whereby they were told they might assess against the defendant a sum which they deemed just and proper, and best calculated to be an example to him and to others, such jury are entitled to observe these instructions in good faith as meaning just what they say. How, then, can it be said that their verdict is perverse? They disregarded no evidence and violated no instructions in fixing these exemplary damages. Their estimates of what would be sufficient as a punishment and a deterrent and an example was very high as compared with the actual damages assessed and high from any point of view, but it would hardly be candid to invite them in the language of this instruction to fix such sum which expressed their judgment in such matter, and then charge them with bias or perversity because the measure of their abhorrence of defendant's conduct and their judgment of what would be a sufficient punishment and deterrent was represented by a larger sum of money than that which some other man or men would have allowed."

We cannot say upon the record before us that the damages awarded by the jury, either actual or punitive, have been given under the influence of passion or prejudice, and hence the award cannot be disturbed.

### III.

Appellant has called attention to the alleged misconduct of the plaintiff before the jury. In some of the instances referred to objection was made, but in others no objection

was interposed, and this group includes the principal claim
of misconduct wherein the plaintiff in his argument to the
jury, referring to the defendant, said: "The rottenest cor-
poration I know of in California to-day is this same corpora-
tion." In no case was the court requested to instruct the
jury that the conduct objected to was improper and that it
was to be disregarded by them. [9] Where the action of
the trial court is not thus invoked the alleged misconduct will
not be considered on appeal, if an admonition to the jury
would remove the effect thereof. (*People* v. *Shears*, 133 Cal.
154, [65 Pac. 295]; *People* v. *Babcock*, 160 Cal. 537, [117 Pac.
549]; *Grossetti* v. *Sweasey*, 176 Cal. 793, [169 Pac. 687].)
From an examination of the record on this point we are of the
opinion that even if the plaintiff had been guilty of miscon-
duct, an admonition from the court would have removed the
effect thereof in every instance.

## IV.

Under the heading, "Other errors in the admission of evi-
dence," appellant mentions, first, the testimony of Mr. Ritter
and of Mr. Roach regarding the interview between Mrs. Hill-
man and several reporters, including a representative of the
"Los Angeles Times," which took place in the office of the
respondent the day before the publication of the libel com-
plained of in this action. A motion was made at the trial
to strike out certain portions of this testimony on the ground
that it was immaterial and irrelevant, which motion was de-
nied by the court. Appellant assigns this ruling as error.
There is no merit to this objection. The testimony was clearly
relevant and material as bearing upon the good faith of the
defendant in publishing the article in suit, and also upon the
question of actual malice.

A further assignment of error under this head is the admis-
sion in evidence of the verified complaint in the Hillman case,
it being contended that the subject matter of the complaint
was beside the issue, and that acts of cruelty therein detailed
may have given the jury the impression that the respondent
was "a veritable St. George." This evidence was offered for
the purpose of "establishing the motives of the attorney filing
the complaint." The court in admitting this evidence stated
to the jury that the "facts and allegations therein are not to
be deemed to be taken by you conclusively as true, but they
are evidence of what was told Mr. Scott at the time of filing

the complaint.'' Now, it is not strictly true that this is evidence of what was told Mr. Scott at the time of filing the complaint, because the record shows that Mr. Scott did not personally interview Mrs. Hillman regarding the subject matter of the complaint. The fact is that the verified complaint was handed to Mr. Scott by his subordinate, who drew it, and was signed and filed by Mr. Scott. In other words, the verified complaint constituted the representations on which he as an attorney acted in the case by subscribing thereto and filing it. We think that the argument of respondent in his brief presents the correct reason for holding the complaint admissible: ''The gist of the statements attributed to Hillman and his fourteen year old son, in the article upon which this action is based, was that Mrs. Hillman had *no cause* for divorce, and that the suit was the result of respondent's *meddling* and attempt to *ruin* Hillman and *'break up his home to fill his own pocket.'* The respondent has the right to show these statements were false, and the complaint sworn to by Mrs. Hillman and signed by respondent as her attorney was competent to show that if her allegations were true she did have a well-grounded cause for divorce, and the suit was not filed by her as a result of being 'wrought up' by respondent, pursuant to a conspiracy to ruin the defendant and break up his home.'' [10] The complaint was admissible for the purpose of showing the nature and character of the charges made by Mrs. Hillman against her husband under oath, and the fact that the plaintiff by filing said complaint acted upon such representations.

In addition to the foregoing it is urged that the court erred in allowing the respondent to give a ''biographical sketch of himself.'' This contention cannot be supported. [11] It has been held that in an action for libel it is proper for the plaintiff to testify as to his early life and training, as well as to show that he has children, that when he settled in the town of his residence his resources were limited, and that by his own industry he has built up a successful business. (*Smith* v. *Hubbell,* 142 Mich. 637, [106 N. W. 547]; *Cyrowsky* v. *Polish American Publishing Co.,* 196 Mich. 648, [163 N. W. 58].)

## V.

It is next urged by appellant that ''the court erred in allowing plaintiff, who was represented by an attorney at law, to

CLXXXI Cal.—24

appear as his own attorney, and in permitting him to argue the case to the jury.'' In support of this contention appellant quotes from *Boca etc. R. R. Co.* v. *Superior Court,* 150 Cal. 153, [88 Pac. 718], as follows: ''It is, however, the settled law of this state that while a party to an action may appear in his own proper person or by attorney, he cannot do both, and that as long as he has an attorney of record in an action the court cannot recognize any other as having management or control of the action, and the party can act only through his attorney.'' It is to be noted, however, that an entirely different situation from the one before us was there presented. The plaintiff corporation in that case had through its attorney of record moved to dismiss a certain action instituted by it. While this motion was still pending a written request or notice of dismissal was sent to the clerk of the court by the manager of the plaintiff corporation. It was held that the order of the court ignoring this notice was properly made; the court pointing out further that until an attorney has been removed or substituted ''the client cannot assume control of the case.'' **[12]** While this case correctly states the law on the issues there involved, it does not apply here.

A situation practically identical to the one in this case was presented in *Conroy* v. *Waters,* 133 Cal. 211, [65 Pac. 387]. It was there said: ''Appellant further objects that plaintiff, who is an attorney at law, licensed to practice before all the courts of this state, was represented on the trial by Lucian Earle, his attorney of record, and that upon motion of Lucian Earle, plaintiff was by order of the court 'associated' with said Earle as attorney in the case. It was contended that this was a special privilege conferred upon the plaintiff whereby he was allowed not only to appear by attorney, but at the same time to appear in person. Whatever irregularity may be detected in this order of the court, we think it sufficient to say that it was clearly an irregularity without injury, and that no reversal of the case should be had for the assigned reason.''

## VI.

Appellant complains of the action of the trial court in refusing to give instructions 2 and 3 requested by the defendant. Instruction 2 reads in part: ''It is the duty of an attorney at law to take care and to ascertain what the facts in regard to his client's case are before advising the client

as to his or her legal rights and the legal steps to be taken to obtain relief.'' Appellant does not point out the applicability of the instruction to the facts. It is probably addressed to the claim of appellant that the Hillman divorce action was brought prematurely by the plaintiff. In any event, we do not think the failure to give the instruction in any way prejudiced the rights of the defendant. Moreover, instruction No. 22 which was given contains this language: ''A lawyer whose services are sought by husband or wife with a view of commencing an action for divorce, is not justified, through hope of gain or other advantage to himself, to take any action to prevent such reconciliation.''

Defendant's instruction 3, which was refused by the court, reads in part: ''It is not sufficient on the issue of malice for the plaintiff to prove that the defendant had malice against him, but plaintiff must go further and prove that the publication complained of was made by defendant because of the malice complained of.'' It is a sufficient answer to this objection to state that the substance of this instruction was given, among others, in instructions Nos. 8, 9, 12, 28, 35, and 36. For instance, the latter instruction declares in part: ''You can consider the articles published in the newspaper of the defendant prior and subsequent to the publication of the article complained of only as bearing on the question as to whether the article complained of was published by the defendant with actual malice. . . . ''

The action of the trial court in refusing defendant's instructions Nos. 5, 7, 8, and 9 is also assigned as error. But the objections are merely stated without any citation of authority or any argument beyond the bare statement that ''the court also erred in refusing to give defendant's requested instructions.'' **[13]** We do not feel called upon to consider points so presented. (*Gray* v. *Walker,* 157 Cal. 381, [108 Pac. 278]; *Born* v. *Castle,* 175 Cal. 680, [167 Pac. 138]; *Dore* v. *Southern Pacific Co.,* 163 Cal. 182, [124 Pac. 817].)

The judgment is affirmed.

Shaw, J., Wilbur, J., Lennon, J., Olney, J., Melvin, J., and Angellotti, C. J., concurred.

Rehearing denied.

All the Justices concurred.