[Crim. No. 22266. Feb. 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH TERRY COLEMAN, Defendant and Appellant.

72

**COUNSEL**

Thomas W. Condit, under appointment by the Supreme Court, and Bradley A. Bristow for Defendant and Appellant.

Quin Denvir, State Public Defender, Christine Zilius, Deputy State Public Defender, Ralph Santiago Abascal, Albert H. Meyerhoff, Richard M. Pearl, Ronald T. Vera, Morris Baller, John Huerta, Vilma Martinez, Peter Schey and Gary Goodpaster as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Joel Carey, J. Robert Jibson and Raymond L. Brosterhous II, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REYNOSO, J.**—This is an appeal from a judgment of conviction entered after defendant was found guilty by a jury of two counts of first degree murder, one count of second degree murder (Pen. Code, §§ 187, 189),[1] and assault with intent to commit murder (former § 217, repealed by Stats. 1980, ch. 300, § 2, p. 628). The jury additionally found that defendant used a firearm in the commission of the murders (§ 12022.5), and it found to be true the alleged "special circumstance" that defendant committed multiple murders (§ 190.2). The prosecution having declined to seek the death penalty, defendant waived jury trial of the penalty phase of the proceeding, and was sentenced to life imprisonment without possibility of parole for one conviction of murder with special circumstances. Sentences on the remaining counts were ordered to run concurrently and merged with the life sentence. The jury found the defendant sane.

Defendant raises a number of issues on appeal, notably the propriety of excluding noncitizens from juries (an issue raised in *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734, 593 P.2d 595]), admissi-

---

[1]Unless otherwise indicated, all statutory references are to the Penal code.

bility of a tape-recorded jailhouse conversation and of letters written long before the murders by one of the victims (his wife, Shirley Coleman) which accused him of threatening on numerous occasions to kill his family, and the propriety of remanding this case to the sentencing court to permit it to exercise its discretion under section 1385 whether to strike the special circumstance in accordance with *People* v. *Williams* (1981) 30 Cal.3d 470 [179 Cal.Rptr. 443, 637 P.2d 1029].

We find the admission of three hearsay letters written by the victim a substantial period of time before her death, which referred to alleged prior threats against her by defendant and her fear of future violence, was error which prejudicially affected defendant's trial and we reverse the convictions. (See, *Shepard* v. *United States* (1933) 290 U.S. 96 [78 L.Ed. 196, 54 S.Ct. 22]; *People* v. *Hamilton* (1961) 55 Cal.2d 881 [13 Cal.Rptr. 649, 362 P.2d 473]; *People* v. *Talle* (1953) 111 Cal.App.2d 650 [245 P.2d 633].) Because we reverse on this basis, we do not decide defendant's remaining contentions of error.[2]

On March 4, 1978, after an argument with his wife about household expenses which led to a heated exchange concerning the couple's other marital problems, including the wife's past infidelities, defendant retrieved a rifle and shot her, fatally, in the base of the head. He then went upstairs to a bedroom and killed his 9-year-old son and 16-year-old niece and shot at (but missed) his 13-year-old daughter, Kimberly.

Kimberly testified that when she arrived home that evening at 7, her parents were seated at the kitchen table "figuring out bills." After taking a bath, Kimberly came downstairs at one point, about 10 p.m. She heard defendant accuse his wife of twice paying a debt to the niece. When she denied it, he asked, "Are you willing to pay the consequences if you are wrong?"

Kimberly went upstairs to bed. She and her brother and cousin remained awake listening to the radio with the door slightly ajar. After about an hour, Kimberly heard someone come upstairs and walk past the bedroom then return downstairs. A minute or two later, the children heard a loud shot. Kimberly heard defendant say, "I won't have to take any more of this [expletive deleted]." Suddenly, the bedroom door "flew open," and de-

---

[2]We note that defendant and various amici curiae, including the State Public Defender, American GI Forum, League of United Latin American Citizens and the Mexican-American Legal Defense and Educational Fund, Inc., have filed extensive briefing urging that that exclusion of noncitizens from the jury venire violates a defendant's constitutional right to a jury drawn from a fair cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) We need not reach this issue in this case.

fendant appeared with a rifle in his hand. Defendant told them, "I'm sorry I have to do this." The children screamed and scrambled under the bed in an attempt to hide. The niece screamed, "No, Uncle Ralph, don't," and was shot. Defendant then threw the bed out of the way and shot his son, Kevin. Finally, he shot at Kimberly, whose face he narrowly missed.

Defendant left the room. Five or ten minutes later, Kimberly emerged from the bedroom. She heard defendant call her name, and, a minute or two later, she went downstairs and saw him talking on the telephone. She saw her mother's body in the kitchen. She went over to defendant and embraced him. He stuttered and repeated the name of his sister, and asked Kimberly to talk to her on the telephone. He also told Kimberly he was "sorry." Defendant subsequently walked upstairs. His sister, upon hearing what had happened, advised Kimberly to leave the house quickly, without telling defendant, which she did.

After Kimberly left, defendant called the police and stated that he had "killed [his] family." (Some neighbors who had heard the screams and shots had already called them.) When police arrived, defendant was sitting on the sofa with his face in his hands. He admitted either that he had "just shot" or "just killed" his family. All the victims had been shot in the head, Shirley Coleman from a distance of probably less than a half-inch, according to the pathologist.

The defenses were diminished capacity and insanity. Defendant testified that he and his wife sat down to pay bills at 6 or 6:30 p.m. Although he consumed perhaps three 16-ounce cans of beer in the approximately five hours before the shootings, he was "thinking fairly clearly." (His blood alcohol was measured at .05 percent an hour after the slayings.) About the time the children arrived home, defendant and his wife began to argue. The argument became bitter when defendant became "angry" at her because of a charge at a department store. As the argument "began to get more heated and more heated," defendant brought up his wife's past deceit and infidelities and accused her of resuming her difficult and uncooperative ways. At some point in this diatribe, his wife observed that there was nothing he could do about it, "it" referring to the "situation that [they] were in." At that, defendant went to his room, retrieved the rifle, removed it from its case, returned to the kitchen, and shot his wife. (He testified that he shot her in the face from a distance of six or eight feet; he was at a loss to explain the pathologist's testimony that the wound indicated that the bullet entered the base of her head from less than an inch away.)

When he went upstairs to retrieve the rifle, defendant "guess[ed] [he] would have had to" have decided to kill his wife, but he could not recall

thinking purposefully. He testified that "everything we had been discussing, everything from the past just all blurred together" and that he "wasn't thinking about anything." When he pointed the rifle at her, he "wasn't thinking" of his act in such a way that he was aware that it would "probably kill" his wife. He never thought about whether he was justified in shooting her or whether there was an excuse for doing it. Immediately, he started up the steps toward the children's room. He "didn't think" about whether he had decided to kill the children. Nor did he recall thinking that he would kill them to spare them difficult lives, though when he was examined by "the doctors" he guessed that was what he thought. He only vaguely remembered the actual shootings, though he remembered a scream and shooting into the darkened room.

For a long time prior to the killings, defendant, who is black, had suffered a good deal of stress related to his wife's past infidelity and to perceived job discrimination and harassment due to his interracial marriage to a caucasian woman. He came to suspect a number of friends and acquaintances in his hometown of possible participation in a conspiracy to "project[] . . . things" at his family and him, with his wife as the apparent focal point of the conspiracy. At his brother's suggestion, sometime after the family's arrival in California, defendant compiled a list of "people involved" with "the things that were going on in Youngstown, Ohio"—i.e., people who "could possibly be a part of the things that were projected at my family and myself," which included such diverse persons as his wife's family (her parents strongly opposed the marriage), some policemen acquaintances, one of defendant's sisters, some marine buddies, their pastor (with whom defendant's wife admittedly had an affair), and a priest with suspicious "mannerisms."

As early as 1972, defendant complained of difficulties at work apparently related to his marriage. On one occasion he overheard some fellow employees at Strauss Stores in Youngstown obliquely intimating that his wife was a prostitute. After a confrontation with a sales clerk over a 25-cent bonus commission, defendant began to suffer "constant harassment," in the form of small incidents seemingly calculated to make his work more difficult, such as disturbing the mannequins and the cutting up of sales sheets into ribbons which defendant would have to piece together. After a temporary stint at U.S. Steel, defendant went to work at an assemblyline job at General Motors (GM). After a time, coworkers at GM began to drop hints about an affair between defendant's wife and his pastor. "Harassment" followed, in the form of an overload of work, delayed breaks, speeding up of the line, and one incident in which defendant's car headlights were left on. "[O]nce or twice," people told defendant what he had had for breakfast, leading him to suspect the house was "bugged" by "some agency of some sort," pos-

sibly the police (defendant perceived a possible connection between some policemen acquaintances and an occasion on which he was stopped for speeding) or the FBI or the CIA.

In 1974, while he was still at GM, defendant sought help at a local mental health clinic for marital problems stemming from his deepening suspicions that his wife was having an extramarital affair. During this time, on a visit to Boston, where his brother lived, to search for a new job, defendant visited a drugstore and felt that some people were looking at him and laughing. Apparently a short time later, his wife admitted she was having an affair with the pastor of their church. After publicly accusing the minister before the congregation, defendant filed for divorce, but it was not granted, apparently because the couple had continued cohabiting. With the affair thus generally known in the community, defendant decided it would be best to leave Youngstown and "try and make it all over again."

The family came to California. They lived in Anaheim for a short time, defendant taking a "menial" job at a security firm as a stopgap. They soon moved to Redwood City, and defendant got a job as a raw materials inspector at an electronics firm. Soon after he started, when he was advised that the company was conducting a background check, he demanded to see his personnel file. About a week later, he was advised that the company had obtained no record of his ever having lived in Youngstown, and more information was sought from him. This led defendant to have his wife talk to this person, which meeting she surreptitiously tape recorded. Defendant did not feel harassed at the electronics firm, but left it when he did not get a promised raise.

The family moved to Sacramento in 1976. Defendant worked in a clothing store for about two months, but again "little things" began to happen. One or more of the salesmen undertook to undo some of the work he had done and otherwise confuse him. On one occasion, one of them winked at defendant in a manner that suggested he (defendant) was a homosexual. On another occasion, when his wife and son visited the store, a strange woman wearing sunglasses appeared to be watching them. Defendant then took a job at a K-Mart store, which he left after three months because of a dispute over required weekend work. Defendant testified that a month before he left, when he was transferred to a second store because of an apparent personality conflict, he was advised by a company employee that he was "branded."

After a seasonal job of short duration at the Campbell Soup Company, at which he suffered "[h]arassment," defendant obtained work as a janitor for the state Department of General Services, which he retained until the date

of the killings. There, too, he felt he was subjected to harassment because of his interracial marriage. Several coworkers confirmed that there was some racial joking among the janitors. Defendant generally impressed them as a calm, quiet individual and a devoted father.

Between 1975 and 1978, defendant and his wife (whom he had apparently convinced of the existence of a conspiracy against him) consulted several lawyers, a private investigator, and numerous public agencies seeking to discover whether the harassment he felt he had experienced was the result of information in his records relating to his interracial marriage. At Mrs. Coleman's request, the Governor's office wrote for letters of reference to GM and to the electronics firm at which defendant had been employed. Both indicated that his employment had been satisfactory. In addition, they wrote letters to a state senator, the United States Department of Justice, the FBI, the Office of Management and Finance, and the Department of Labor.

Extensive psychological and psychiatric testimony was presented both by the defense in support of the diminished capacity and insanity defenses, and by the prosecution in rebuttal of those theories.

The first of several expert witnesses called by the defense, Dr. Herbert Weissman, a clinical psychologist, gave defendant a battery of psychological tests about a month after the offenses, and another in 1979. He did not render an opinion as to defendant's mental state at the time of the killings, but testified that, at the time the tests were administered, defendant exhibited a low capacity to adjust to stress and less-than-normal ability to discharge hostility, accompanied by, and attributable to, strong indications of paranoid and depressive psychosis. He opined that defendant was subject to periods of "psychotic decompensation"—i.e., "breakdown[s] involving gross distortion in various ways of interacting with the world, behaving, mood, and so on" to fit the delusional posture.

Dr. Allen Axelrad, a psychiatrist, opined on the basis of five interviews with defendant and consideration of a large volume of documentary evidence (including defendant's correspondence with federal agencies, recordings of interviews with relatives, and transcripts of defendant's testimony), that he suffered from an ongoing mental disorder, paranoia, at the time of the offenses. He had psychotic delusions that he was the victim of conspiratorial persecution. Dr. Axelrad testified that defendant's argument with his wife that night dredged up painful memories and led to a "sudden" conviction that his wife had betrayed him and was part of the conspiracy. This "flooding" of his memory due to extreme stress, Dr. Axelrad believed, triggered a temporary break from reality of a few hours' duration which could be characterized as a "psychotic dissociative reaction" or, in the

language of the then-about-to-be-effective Diagnostic and Statistical Manual, Third Edition, of the American Psychiatric Association (DSM III), a "brief reactive psychosis." On this basis, Dr. Axelrad concluded that defendant was insane in that he lacked substantial capacity to appreciate the criminality of his actions or to conform his conduct with the requirements of law. (See *People* v. *Drew* (1978) 22 Cal.3d 333 [149 Cal.Rptr. 275, 583 P.2d 1318].) He also testified that due to the impact of his condition on his judgment and emotional stability, defendant lacked the capacity to "maturely and meaningfully premeditate and deliberate" or even to form an intent to kill.

Dr. Ronald Markman, a psychiatrist who examined defendant in 1978 at the prosecution's behest testified for the defense. Dr. Markman was of the opinion, based on his interview and consideration of a quantity of documentary evidence (including defendant's trial testimony), that defendant did not suffer from an ongoing psychosis, but a less severe condition known as a "paranoid personality disorder." Nevertheless, at the time of the shootings, he opined, defendant underwent a "psychotic decompensation" characterized as a "gross stress reaction" in the terminology (which Dr. Markman still preferred) of the DSM I. Dr. Markman testified that in his view, defendant *was* able to appreciate the criminality of his behavior and to conform his conduct to the law when he shot his wife, but, due to the impairment of his judgment resulting from his paranoid thinking, lacked the capacity to "maturely and meaningfully deliberate" concerning that act.[3] Dr. Markman believed, further, that the act of shooting his wife precipitated "an immediate and acute decompensation" of "psychotic proportions" which rendered him incapable of conforming his subsequent conduct to the law. The killing of his wife, the psychiatrist opined, triggered a regression by defendant, a Vietnam veteran, to "an uncontrollable level of combat behavior." At the time defendant killed the children in Dr. Markman's opinion defendant could not conform his conduct to the requirements of the law and had neither the capacity to premeditate nor to deliberate.

The prosecution called a number of experts on rebuttal. Two of them, Drs. Lee Coleman, a psychiatrist, and Bernard Ziskin, a psychologist, testified, in essence, that psychiatry is not sufficiently developed as a scientific discipline to render psychiatrists any more qualified than laymen to form reliable or valid opinions as to a person's sanity or capacity to form a particular mental state. Dr. Coleman opined that the reliability of psychiatric diagnosis is limited by the lack of objective measurement tools and

---

[3]In 1981, after the offenses in question, section 189 was amended to provide that "defendant need not maturely and meaningfully reflect" on his act to be guilty of first degree murder.

universally accepted descriptive terms, and impeached by the prevalence of a "therapeutic bias" among mental health professionals. He characterized the use of psychological tests such as the Rorschach Test and the Minnesota Multiphasic Personality Inventory as lacking in reliability and inappropriate for use in forming an opinion as to whether an accused possessed a certain mental state at some time in the past. He specifically criticized Dr. Weissman's interpretation of the tests administered to defendant.

Two psychiatrists who at one time had indicated a willingness to testify for the defense but did not do so were called by the prosecutor on rebuttal. Drs. Frederick Whipple and Bruce Kaldor testified that after reading transcripts of defendant's trial testimony they could no longer express an opinion as to his sanity or capacity to entertain malice aforethought or to premeditate or deliberate.

In further rebuttal the prosecution called three experts, two psychiatrists and a psychologist, who testified that defendant was sane and capable of harboring malice and of premeditation. Dr. Walter Bromberg, a psychiatrist, observed defendant's trial testimony and reviewed the reports and testimony of other expert witnesses and summaries of the evidence of defendant's background and the events of the night of the killings. Dr. Bromberg testified that, while defendant exhibited "a paranoid attitude," and might be said to be suffering from a "paranoid personality disorder," his suspicions did not rise to the level of delusions and accordingly, he was not psychotic. He ascribed the killings not to "mental illness," but to defendant's "tremendous anger and humiliation" stemming from continuing stresses in his work and marriage, resulting in an "enormous emotional upset."

Dr. Michael Maloney, a psychologist, interviewed defendant during the trial and gave him various psychological tests. Conceding that defendant was laboring under "enormous stress," and that his history might arguably support a diagnosis of a paranoid personality disorder, Dr. Maloney insisted that he did not "have any data" suggesting that defendant's mind was so impaired as to render him incapable of conforming his conduct to the law, or that "his cognitive and intellectual process [had] been disturbed at all," or that he even suffered from a "mental disorder" at the time of the offenses.

Finally, Dr. Alfred French, a psychiatrist, testified that defendant appeared "mentally normal" when he examined him in September of 1978 under a court appointment. He further opined that defendant was not "mentally disordered" or acting on "psychotic delusional beliefs" when he committed the killings. He described defendant as a "man . . . in terrible chron-

ic pain" who "identified his wife with the pain in a causal way." He killed her simply in order "to make that pain stop." Dr. French admitted that he might have indicated to the prosecutor that, if he had to diagnose defendant's condition, he would characterize it as "a paranoid personality disorder." He also conceded that it was possible for a person subject to "a number of unwarranted beliefs" to undergo a "paranoid psychotic episode" as a result of the type of "colossal stress" that defendant suffered.

In surrebuttal, defendant produced another psychologist, Dr. Alexander Caldwell, who testified as to the usefulness of the Minnesota Multiphasic Personality Inventory, one of the tests administered and relied upon by Dr. Weissman, an earlier defense expert witness.

# I

 Defendant claims the trial court committed reversible error by admitting into evidence the contents of three highly emotional and inflammatory letters written by defendant's wife between August 1976 and September 1977. As we explain below, the risk that the letters would be considered by the jury for improper and highly prejudicial purposes so far outweighed any probative value attributable to them that the trial court must be held to have abused its discretion by permitting extensive quotation from and reading of the letters. (Evid. Code, § 352.)

Although the trial court ruled the letters' contents admissible only for the limited purposes of impeaching defendant's credibility and to explain and challenge the basis for the opinions of the psychiatric experts, and carefully instructed the jury on these limited proper uses for the letters, we agree with defendant that these instructions did not—and could not—adequately insure that the letters would not be considered as proof of the truth of the hearsay accusations they contained. The abuse of discretion in this case constituted prejudicial error. (*People* v. *Hamilton, supra,* 55 Cal.2d 881; *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].)

A. *The Nature of the Letters and the Likelihood of Prejudicial Impact.*

The three handwritten letters at issue are the "Dear Bill and Audrey" letter, dated August 11, 1976; the "Dear Mother" letter, written September 9, 1976; and the "To Whom It May Concern" letter dated September 19, 1977. Each of these letters poignantly describes defendant's wife's feelings of hopelessness and despair in the face of the many personal and marital problems the couple had experienced. The letters allude to both marital partners' suspicions involving defendant's employers and coworkers and

describe extensive contacts with public agencies in an attempt to find out "what happened" and "who did this to us." In one letter the wife admits various marital infidelities while denying others. In both the "Dear Mother" and the "To Whom" letters she expresses remorse for the effect of her selfishness on her family and particularly what she describes as a transformation of defendant "from a gentle, kind-loving man to a very bitter man." In both of these letters the wife says that it is too late to solve the problems and suggests that she is ready to face death.

In addition to describing the generally tragic development of the family's complex problems, the letters contain other allegations which could be considered relevant to the issues at defendant's trial. In the letters defendant's wife states that defendant had "twice before" tried "to hurt" her, that he had "many times" threatened to kill the family, that he did not want his children going through life as he had, and that his wife feared that he would "do this to us and then find out it wasn't me." If these statements were truthful and accurate depictions of past acts of defendant, they would have some tendency to indicate the killings were not rash acts which were uncharacteristic of defendant. In fact the prosecutor argued that the allegations of prior threats of violence showed that defendant had "thought about" killing his wife before and therefore tended to prove that he had in fact premeditated and deliberated before killing her. Information contained in the letters might also be considered to show a motive for the killing of defendant's children.

Insofar as they assert that certain events happened between defendant and the victim, her letters are, of course, entirely hearsay. Because of the wife's death the veracity of the contents of the letters cannot be tested by the conventional method of rigorous cross-examination. At the same time, the fact that the events the wife stated she feared later occurred lends to the letters an almost prophetic aura of truthfulness and accuracy.

All parties recognized the enormous impact which such accusations of past violent threats and behavior might have on the trier of fact called upon to decide the major issues in this case: whether defendant was legally insane or suffering from a diminished capacity to form the mental states which accompany the offense of first degree murder at the time he shot the victims. Whether and to what extent the contents of the letters would be placed before the jury was argued on at least seven occasions prior to and during trial.[4]

---

[4]Defendant moved to exclude the letters from use in any manner because of their hearsay nature and because their probative value on material issues would be far outweighed by their unfairly prejudicial effect. (Evid. Code, § 352.) He further argued that the letters show only

■ The potential for unfair prejudice from the admission of prior statements of a victim declarant regarding either past or future conduct by an accused has been recognized repeatedly by this court and the United States Supreme Court. The limitations imposed on the admissibility of such evidence have been sufficiently stringent as to virtually preclude the evidence unless the victim's state of mind has been placed in issue or the statements are relevant to prove or explain the acts of the victim (e.g., where the defendant claims provocation or self-defense). (*People* v. *Hamilton, supra,* 55 Cal.2d 881, 894.) The rationale is that the " 'true evidentiary bearing of the evidence is at best slight and remote' " and is outweighed by its prejudicial effect. (*Ibid.*)

In *Shepard* v. *United States, supra,* 290 U.S. 96, the Supreme Court reversed defendant's conviction for the murder of his wife because the prosecutor was permitted to introduce a statement made by her three weeks prior to her death in which she accused the defendant of poisoning her. The court rejected various theories supporting admission of the statement but assumed that it might have been relevant to negate the proposition that she had purposefully committed suicide. In spite of this possible relevance the court held admission of the statement prejudicial error. "This fact, if fact it was, the Government was free to prove, but not by hearsay declarations. It will not do to say that the jury might accept the declarations for any light that they cast upon the existence of a vital urge, and reject them to the extent that they charged the death to some one else. Discrimination so subtle is a feat beyond the compass of ordinary minds. The reverberating clang of those accusatory words would drown all weaker sounds. It is for ordinary minds, and not for psychoanalysts, that our rules of evidence are framed. They have their source very often in considerations of administrative convenience, of practical expediency, and not in rules of logic. When the risk of confusion is so great as to upset the balance of advantage, the evidence goes out. [Citations omitted.] . . . [¶] The testimony now questioned faced

---

the mental state of defendant's wife and hence were not a proper basis for expert opinion as to defendant's mental state. (See Evid. Code, §§ 801-803.)

The prosecutor acknowledged the letters were hearsay, but contended they were made admissible by Evidence Code section 1250, to show the wife's mental state. The court, however, ruled section 1250 inapplicable because the mental state of defendant's wife was not in issue. The prosecutor then argued that the fact defendant had read the "To Whom" letter tended to prove that defendant had thought of killing his family before he did so was thus relevant to the issues of premeditation and deliberation. The court rejected this theory as well.

The court similarly rejected the prosecutor's argument that the "To Whom" letter was admissible as an adoptive admission (Evid. Code, § 1221) because defendant failed to confront his wife with the falsity of the accusations it contained, and that the letters were relevant to explain the wife's apparent lack of resistance to the homicidal act. Contrary to the district attorney's argument that the letters had an "intrinsic ring of authenticity" the court found they were not reliable indicia of defendant's state of mind six or more months after the letters were written.

backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury." (*Id.*, at pp. 104-106 [78 L.Ed. at pp. 201-203].)

In *People* v. *Hamilton, supra,* this court also recognized the danger that the jury will be unable to "separate the state of mind of the declarant from the truth of the facts contained in the declarations . . . ." (55 Cal.2d at p. 895.) We said hearsay statements which referred "solely to alleged past conduct on the part of the accused" should not be admitted. Statements of threats of future conduct by the accused, might, in a proper case be admitted, if "shown to have been made under circumstances indicating that they are reasonably trustworthy," and if they "show primarily the then state of mind of the declarant and not the state of mind of the accused." (*Id.*, at pp. 893-894; see also *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Lew* (1968) 68 Cal.2d 774 [69 Cal.Rptr. 102, 441 P.2d 942].)

*People* v. *Talle, supra,* 111 Cal.App.2d 650 involved facts similar to those in the present case. In *Talle,* the defendant's wife wrote a letter, on the advice of her attorney, in which she stated that the defendant had used physical force against her and had threatened to kill her. The letter was written in connection with an action for separate maintenance by the wife. Four months later, the defendant killed his wife and the letter was admitted into evidence at the eventual murder trial. The *Talle* court held that the introduction of the letter was prejudicial error because the state of mind of the victim was never an issue in the case. Furthermore, even if the state of mind was in issue, to be admissible the statement must be made "under circumstances so as to make it reasonably certain it was not the result of a partisan premeditated plan to accuse." (*Id.*, at p. 671.) Thus, such statements "from the grave" were held to be inherently prejudicial and, even if possibly admissible for a limited purpose, required a "reasonably certain" showing of reliability. The *Talle* court stated: "How could the jury possibly disentangle the charges in that letter and treat the letter only as evidence of state of mind, and forget about the substance of the charges? How could the defendant meet such a situation? He could not cross-examine the deceased. Her lips were sealed. Here was a self-serving statement for a particular purpose against which the accused was powerless to defend." (*Ibid.*)

The trial court rejected all proffered grounds for admission of the letters under any exception to the hearsay rule. The court correctly ruled that the wife's state of mind was not at issue in this case and thus that the documents did not fall within the rule permitting use of out of court declarations to

show the state of mind of the declarant. (Evid. Code, § 1250; *People* v. *Ireland, supra,* 70 Cal.2d 522.) The court further ruled correctly that the letters did not tend to prove the state of mind of defendant at the relevant time, and that they could not be viewed as adoptive admissions under Evidence Code section 1221.

The court did rule that the letters could be used by the prosecutor for two limited purposes. First, prior to trial the court ruled that because the expert witnesses had received and considered the letters in reaching their opinions (see Evid. Code, §§ 801, subd. (b), 802), they must submit to cross-examination on the materials. (Evid. Code, § 721.) Secondly, the court ruled that the prosecutor could attempt to frame cross-examination questions which would tend to cast doubt on the truth and veracity of defendant's testimony pertaining to the "To Whom" letter. Defendant testified he had not thought of killing his family before the shootings occurred. Outside the presence of the jury the prosecutor successfully established that defendant had found the "To Whom" letter on a closet shelf approximately one month prior to the killings. Because he was late for school defendant testified that he did not read the entire letter but only "scanned" portions of it. Defendant further testified that he did not then or ever think about the contents of the letter.

Over the strong objections of the defense—which wanted the court to rule on the propriety of each specific question before it was asked in front of the jury—the court ruled the prosecutor could attempt to frame questions going to credibility in front of the jury.

Although this case differs from *Shepard, Hamilton* and *Ireland* because the trial court did not here admit the wife's letters under the state of mind exception to the hearsay rule, we find that the court's attempt to limit the jury's consideration of the contents of the letters was equally futile.

 The cases discussed above recognize two primary dangers from the admission of hearsay declarations of the victim. First is the danger that the hearsay declarations will be regarded as true in spite of a complete absence of legally recognized indicia of their trustworthiness. For example, in both *Hamilton* and *Talle* the appellate court recognized that the victim may have had a motive to misrepresent or exaggerate the conduct of the accused. In the present case there was testimony that the accuracy of the declarant's perceptions and allegations might have been adversely affected by her own psychiatric problems. According to Dr. Axelrad, it was by no means certain that her reports of defendant's behavior were accurate.

The second danger is presented when declarations pertaining to threats of future conduct by the accused are attempted to be admitted for the limited

purpose of demonstrating the mental state of the declarant. Both the *Shepard* and *Hamilton* decisions recognize "that it is impossible for the jury to separate the state of mind of the declarant from the truth of the facts contained in the declarations . . . ." (*People v. Hamilton, supra,* 55 Cal.2d at p. 895.) ". . . [I]t must be inferred that the declarant had this mental state of fear only because of the truthfulness of the statements contained in the assertion. . . . Logically it is impossible to limit the prejudicial and inflammatory effect of this type of hearsay evidence." (*Id.,* at p. 896.)

Both of these dangers are equally present when the hearsay is offered for the ostensibly limited purpose of undermining the veracity of an expert or other witness. The hearsay statements neither lose their inflammatory character nor gain a greater degree of trustworthiness in this situation.

### B. *Cross-examination of Defendant.*

The prosecutor asked defendant a series of questions about references in the "To Whom" letter to alleged prior threats by defendant against his wife. The trial court sustained defense objections to five of the eight questions asked by the prosecutor. (The only questions permitted were whether defendant had read the letter, whether he had thought about anything he read there, and whether he read anything he considered untrue.) In the course of this questioning the prosecutor quoted portions of the letter recounting "many" prior threats and relating the wife's fear of defendant's future acts. Defense objections to inquiries into defendant's memory of these passages were sustained and defendant therefore never explained his view of these hearsay accusations. The court admonished the jury on each appropriate occasion to disregard entirely any question and answer to which an objection was sustained, and that a question in and of itself is not evidence and may be considered only as it supplies meaning to the answer.

In this manner—via a series of largely unsuccessful attempts to fashion proper questions for cross-examination of defendant—the prosecutor was able to bring the most prejudicial portions of the hearsay letters before the jury. The nature of the questions coupled with repeated defense objections must have alerted the jury to the importance of the wife's letter and the sensational nature of its contents. The fact that objections to the most damaging questions were sustained could not, contrary to the Attorney General's contention, cancel the impression thus created in the minds of the jurors. The successful objections may instead have had just the opposite effect, as

the jury was left without any explanation or answer by defendant to the hearsay accusations against him.[5]

█ We hold that the trial court erred in permitting these questions by the prosecutor in the presence of the jury. Assuming there were some questions about the contents of the "To Whom" letter which could have tended to impeach the veracity of defendant's testimony,[6] we note that this function could have been fulfilled without revealing to the jury those details of the letters which did *not* impeach the veracity of defendant's testimony and which were highly likely to be regarded for improper purposes. The trial court was well aware of the potential for extreme unfair prejudice to defendant if the portions of the letters alleging prior threats of violence were improperly considered. The court was also aware that the prosecutor sought to bring exactly those portions of the letters to the attention of the trier of fact and that the prosecutor had difficulty framing questions the court deemed proper. Under these circumstances, the court should have insisted that the prosecutor develop proper questions outside the jury's presence to avoid the possibility that improper evidence would be brought before the jury via improper questions on cross-examination.

## C. *Cross-examination of Expert Witnesses.*

The letters were provided to defense psychiatrists as part of a package of background materials to assist in their evaluation of defendant's sanity. In addition to these letters the package included other letters written and received by defendant and his wife, defendant's account of "people involved," investigator and police reports, transcripts of interviews with friends and relatives of defendant, the report of the autopsy physician and the reports of other medical experts. Each of the experts who testified for the defense had read the letters written by defendant's wife and had considered the letters along with information gleaned from their personal inter-

---

[5]Compare, *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074] in which the Supreme Court reversed a conviction because an improper reading of a codefendant's extrajudicial confession implicating defendant effectively deprived defendant of his right to cross-examine and confront the evidence against him. The court acknowledged that the reading of the alleged statement coupled with the codefendant's refusal to answer questions about it were not technically testimony. Nevertheless, the court found the jury might have inferred both that the statement had been made and that it was true.

[6]It is not clear that such questions existed. The prosecutor never was able to fully understand the basis for the court's ruling. Several times he asked for clarification and an example of a question the court deemed proper. (The court declined to frame the questions for the district attorney.) Perhaps the court believed that defendant's testimony that he had never carefully read or thought about the "To Whom" letter was incredible in view of the extensive testimony regarding suspicions of plots against defendant and of his wife's infidelities. The letter contained defendant's wife's explanation of her conduct during the marriage and her affirmation that she, herself had not plotted against him.

views of defendant and the other materials provided to them in assessing defendant's mental condition.

Because the experts had considered the letters in forming their opinions, the court ruled that the prosecutor must be permitted to cross-examine in order to test the validity of those opinions. (Evid. Code, §§ 803; 721.) The court rejected defense arguments that the letters were unduly prejudicial (Evid. Code, § 352) and that they were not a proper basis for expert opinion on *his* state of mind. (Evid. Code, § 801, subd. (b).) The court fully instructed the jury on the limited uses to which the materials could be put, and permitted defendant to object to specific questions whenever they exceeded the limited scope deemed proper.

During cross-examination of defendant's first expert witness, Dr. Weissman, the prosecutor elicited that the information the doctor had considered in assessing defendant's mental condition included the letters written by defendant's wife. Dr. Weissman stated that the most important sources of his diagnostic information were the ten investigative reports prepared by the public defender's investigator, two personal interviews with defendant, and the two batteries of psychological tests he had administered. The letters he said, served only to reinforce his initial conclusion that defendant suffered from a paranoid psychosis.

More specifically, Dr. Weissman testified that the letters indicated a sadomasochistic theme in the marriage with both defendant and his wife displaying an intention to hurt each other. When asked specifically about the reference to threats of violence contained in the "Dear Mother" letter, the doctor responded that these portions did not necessarily demonstrate the sadomasochistic pattern.

The prosecutor then read specific paragraphs from the "To Whom" letter and asked Dr. Weissman if they were accurate. After exploring some of the details of the marital affairs the prosecutor came back to the letters, asking about their suicidal character and the doctor's opinion about the wife's mental state. Finally, the prosecutor asked Dr. Weissman to read the "To Whom" and "Dear Mother" letters into the record, verbatim. The court permitted the reading. It was preceded and followed by limiting instructions to the jury. The letters were subsequently marked as exhibits and defendant renewed his standing objection to use of the letters in any fashion.

The second defense expert, Dr. Axelrad, testified on direct examination that he had considered the three letters written by defendant's wife in conjunction with other materials and four personal interviews with defendant. Dr. Axelrad found the letters useful because they indicated that defendant's

paranoid illness had manifested itself after the couple moved to California, and portions of the "To Whom" letter described the paranoid delusion from which defendant suffered. The letters also showed that defendant's wife was very supportive of his illness. Dr. Axelrad further stated that defendant's wife had been the "best observer" of defendant's behavior.

When defense counsel specifically asked Dr. Axelrad about the allegations of prior threats, the doctor stressed that there was no way to evaluate the truth of the allegations, especially in light of the indications that the victim, too, suffered some mental problems. Assuming that they were true, the doctor stated they would be consistent with the diagnosis of paranoia and his opinion that the killings occurred during a brief reactive psychosis. Dr. Axelrad stressed that defendant did not have a history of acting on such threats and opined that the letters did not tend to shed light on the issues of premeditation and deliberation at the time of the killings.[7]

On cross-examination the prosecutor confronted Dr. Axelrad with the allegations of prior threats, the victim's statement of fear about the future, and defendant's admission that he had pointed a gun at his wife on one occasion prior to the shootings. None of this swayed Dr. Axelrad from his opinion that defendant had been insane at the time of the killings.

Dr. Markman testified that during a psychiatric interview defendant had admitted pointing a gun at his wife's head during an argument several years prior to the killings. On cross-examination the prosecutor asked whether Dr. Markman was aware that the "To Whom" letter alleged defendant had threatened his wife *twice* before and whether he had confronted defendant with this allegation. The doctor was aware of the allegation but had not confronted defendant with it. During the People's rebuttal case, Dr. French testified that he was aware of the allegations of prior threats contained in the "To Whom" and other letters. To him these allegations indicated that acts of violence were not foreign to the marital relationship between defendant and his wife.

---

[7]Although the defense brought portions of the letters before the jury in its own examination of Dr. Axelrad, this should not be construed as a waiver of the consistent objections to use of the letters or as a mitigation of the error in permitting extensive quotation and reading of the letters. At this point in the trial the prosecutor had successfully brought the allegations of prior threats and fears of future danger to the attention of the jury through cross-examination of defendant and Dr. Weissman. Dr. Weissman had, at the prosecutor's request and over repeated defense objections, read the full contents of the "To Whom" and "Dear Mother" letters into the record. Defense counsel under these circumstances made a reasonable tactical decision to minimize the damage done by the prosecutor by himself questioning his expert on the effect of the letters. We note that the defense did not read excerpts from the letters and limited its questions to the effect the wife's allegations had on the doctor's diagnosis.

Evidence Code section 801 permits an expert to testify to an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, *whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates,* unless an expert is precluded by law from using such matter as the basis of his opinion." (Evid. Code, § 801, subd. (b); italics added.)

On direct examination an expert may testify to the reasons for his or her opinion and the matter upon which it is based, unless he or she is precluded by law from using such reasons or matter. (Evid. Code, § 802.) Those parts of an opinion that are based in whole or significant part on matter that is not a proper basis must be excluded upon objection, though the expert may testify to that portion of the opinion which is based on proper matter. (Evid. Code, § 803.) Evidence Code section 721, subdivision (a) specifically provides for the cross-examination of an expert on "the matter upon which his opinion is based. . . ."

Two Courts of Appeal have considered whether an expert may reasonably rely on inadmissible lay-person hearsay in forming a psychiatric opinion. In *Board of Education* v. *Haas* (1978) 82 Cal.App.3d 278 [147 Cal.Rptr. 88] a schoolteacher was suspended after a finding by a panel of three psychiatrists that she was sufficiently impaired by mental illness to render her incompetent to teach. The schoolteacher attacked the finding against her on the basis that a personnel file containing inadmissible hearsay was used, in part, by the psychiatrists in forming their opinions. The file contained information gathered from students, school administrators and fellow teachers. She contended that the information in the file was generally unreliable because it was compiled by lay-persons and was not evaluated for accuracy.

Holding that the trial court had properly admitted the testimony, the Court of Appeal stated: "In the case at bench the trial court properly exercised its discretion in admitting the expert opinion testimony. Granting that the information in the files did not meet strict standards of reliability, it nevertheless helped the psychiatrists to determine how they would conduct the interview, and what areas they would explore. They testified that the letters and other memoranda in the file indicated that Ms. Haas had serious problems at work which included delusions about how others were treating her. Furthermore, each psychiatrist stated clearly that no opinion had been formed until after the interview had confirmed his suspicions. It is apparent that the interview just as easily could have dispelled those suspicions. The trial court properly determined that the information in the personnel file was of a type upon which experts were entitled to place reasonable reliance.

This is especially true in light of the manner in which the personnel file as used by the experts, and in view of the difficult area of psychiatric expertise. Experts in fields such as psychiatry should not be left to form their opinions in a vacuum." (82 Cal.App.3d at pp. 282-283.)

*Board of Trustees* v. *Porini* (1968) 263 Cal.App.2d 784 [70 Cal.Rptr. 73], came to a different conclusion about the use of hearsay. In *Porini*, a school board suspended a teacher on the basis that she was incompetent due to mental disability. A psychiatrist testified at the trial of the matter that mental disorders prevented the teacher from completing her job. He based his opinion on a personal interview with the teacher along with a tape recording, some letters, and a voluminous dossier of "other material." Although he never characterized the "other material," the psychiatrist testified that the various materials helped him assess the background of the teacher in order to ask her questions.

The appellate court reversed the trial court's decision to suspend the teacher on other grounds. Considering the propriety of the expert testimony the court recognized danger in any inflexible rule regarding the use of lay third-party information in forming expert psychiatric opinions. "A case-by-case determination italicizing the Evidence Code section 801 test of 'reasonable reliability' seems as definitive as a reviewing court should attempt to become." (263 Cal.App.2d at p. 794.) The court ordered the determination whether the psychiatrist had properly used the hearsay information in forming an opinion be made at the new trial.

Neither *Haas, supra,* 82 Cal.App.3d 278, nor *Porini, supra,* 263 Cal.App.2d 784, contains any indication that the hearsay relied upon by the psychiatric expert was itself presented to the trier of fact to explain the expert's opinion. In both cases, in fact, the hearsay was used to assist the experts in preparation for personal interviews with the teacher whose mental condition was at issue. The cases are not therefore dispositive of defendant's claims of error.

■ California law gives the trial court discretion to weigh the probative value of inadmissible evidence relied upon by an expert witness as a partial basis for his opinion against the risk that the jury might improperly consider it as independent proof of the facts recited therein. (*People* v. *Chapman* (1968) 261 Cal.App.2d 149, 178-179 [67 Cal.Rptr. 601].) In *Chapman* the appellate court upheld the exclusion of a hearsay statement by the defendant which was offered because it had been relied upon by a defense psychiatric expert. The court ruled that "the doctor's use of Mrs. Chapman's St. Joseph statement did not open the door to its being read to the jury. Such a statement has limited admissibility." (*Id.*, at p. 178.)

In *Grimshaw* v. *Ford Motor Company* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348], the Court of Appeal explained the current state of the law. ■■■ "While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. (*People* v. *La Macchia* (1953) 41 Cal.2d 738, 744-745 [264 P.2d 15], overruled on other grounds in *County of Los Angeles* v. *Faus* (1957) 48 Cal.2d 672, 680 [312 P.2d 680]; *Baily* v. *Kreutzmann* (1904) 141 Cal. 519, 521-522 [75 P. 104]; *Intoximeters, Inc.* v. *Younger* (1975) 53 Cal.App.3d 262, 273 [125 Cal.Rptr. 864]; *Furtado* v. *Montecello* [*sic*] *Unified Sch. Dist.* (1962) 206 Cal.App.2d 72, 79-80 [23 Cal.Rptr. 476]; *People* v. *Nahabedian* (1959) 171 Cal.App.2d 302, 310-311 [340 P.2d 1053].) The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence. (*People* v. *La Macchia, supra,* 41 Cal.2d 738.) Ordinarily, the use of a limiting instruction that matters on which an expert based his opinion are admitted only to show the basis of the opinion and not for the truth of the matter cures any hearsay problem involved, but in aggravated situations, where hearsay evidence is recited in detail, a limiting instruction may not remedy the problem. (Evid. Code, §§ 352, 355; see *Conservatorship of Buchanan* (1978) 78 Cal.App.3d 281, 289 [144 Cal.Rptr. 241]; *Kelley* v. *Bailey* (1961) 189 Cal.App.2d 728, 738 [11 Cal.Rptr. 448]; see also *Adkins* v. *Brett* (1920) 184 Cal. 252, 258 [193 P.251].)" (119 Cal.App.3d at pp. 788-789.)

■■■ The courts have traditionally given both parties wide latitude in the cross-examination of experts in order to test their credibility. (*People* v. *Tallman* (1945) 27 Cal.2d 209, 214 [163 P.2d 857]; see, e.g., *People* v. *Whitmore* (1967) 251 Cal.App.2d 359, 366 [59 Cal.Rptr. 411].) Thus, a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion. (See *People* v. *Odom* (1980) 108 Cal.App.3d 100, 115 [166 Cal.Rptr. 283].)

Nevertheless, the trial court must exercise its discretion pursuant to Evidence Code section 352 in order to limit the evidence to its proper uses. The exercise of this discretion may require exclusion of portions of inadmissible hearsay which were not related to the expert opinion. (See *People* v. *Brown* (1958) 49 Cal.2d 577, 587 [320 P.2d 5] [testimony that declarant told phsyician that she " 'went to a residence south of the City' " should have been stricken since it was not a declaration upon which the doctor based his opinion that declarant had undergone an induced abortion].) Or it may be necessary to sever portions of the testimony in order to protect the

rights of the defendant without totally destroying the value of the expert witness' testimony. (See, *People* v. *Washington* (1969) 71 Cal.2d 1061, 1082 [80 Cal.Rptr. 567, 458 P.2d 479] [cautionary dictum].) In still other cases where the risk of improper use of the hearsay outweighs its probative value as a basis for the expert opinion it may be necessary to exclude the evidence altogether. (See, *People* v. *Modesto* (1963) 59 Cal.2d 722, 732-733 [31 Cal.Rptr. 225, 382 P.2d 33] [exclusion of tape recording of defense psychiatrist's hypnotic interview with defendant would have been a proper exercise of discretion]; *People* v. *Reyes* (1974) 12 Cal.3d 486, 503-504 [116 Cal.Rptr. 217, 526 P.2d 225] [trial court properly ruled that 20-year-old medical report pertaining to the psychiatric diagnosis of the victim was an extraneous issue which should not be the subject of questioning where it played only an insignificant role in medical experts' conclusion that defendant suffered from diminished capacity].)

 In this case we conclude that the trial court abused its discretion by permitting extensive questioning of the expert witnesses on the contents of the letters in which defendant's wife claimed, inter alia, that he had previously threatened her with violence. Accusatory statements "from the grave" such as these have so great a potential to unfairly prejudice the defendant that the courts have long recognized that a limiting instruction will be insufficient to prevent improper use. (*Shepard* v. *United States, supra,* 290 U.S. 96; *People* v. *Hamilton, supra,* 55 Cal.2d 881; *People* v. *Ireland, supra,* 70 Cal.2d 522; *People* v. *Talle, supra,* 111 Cal.App.2d 650.) Here the letters were only a small portion of the material on which the psychiatrists based their opinions and were not cited by them as items of major significance in their evaluation of the defendant's mental capacity. (See *People* v. *Reyes, supra,* 12 Cal.3d 486.) Finally, those portions of the letters which the prosecutor legitimately offered to challenge the psychiatric opinions could have been selected and presented in a fashion which would have lessened their emotional impact and would have avoided the improper inference that the victim's accusations were true.

### D. *Prosecutor's Closing Argument.*

The trial court denied the prosecutor's motion, made at the close of evidence, to have two of the victim's letters admitted into evidence for all purposes. In his closing argument the prosecutor read excerpts from all three letters describing prior threats and the victim's fears of defendant and used these excerpts to attack the credibility of the defense psychiatrists. "I want to cite to you excerpts from [the letters] which make it quite clear . . . and which would have made it quite clear to Doctors Markman and Axelrad had they had an open mind, that the defendant thought about killing his wife and children before he did . . . and that the killings were not out of char-

acter or foreign to his character." After reading from the letters he continued: "How could Dr. Markman, knowing of these letters, say to you that he didn't know of any evidence that on previous occasions Ralph had thought of killing his wife and the children? . . . How can he say that knowing of these letters? How could Dr. Markman and Dr. Axelrad say the killings were motiveless . . . when they had this evidence? They had this evidence which makes it quite clear, as does other evidence, that these were not motiveless killings. . . . Is it not quite clear insofar as the psychiatric testimony is concerned that Dr. French's analysis is correct? The killings were in a direct line with what had gone before. They were in context. The defendant had thought about killing before. This was no sudden rash impulse. . . ."

Defendant claims these arguments demonstrate that the district attorney could not himself distinguish the legitimate purpose for which the letters were admitted from the hearsay purpose of showing premeditation and deliberation. We agree. Although the prosecutor attempted to form his argument as one which simply undermined the credibility of the opinions of the defense experts, this purpose could be served only to the extent the jurors considered the letters accurate evidence of defendant's prior thoughts and behavior. The prosecutor himself occasionally argued that the letters constituted direct proof of deliberation and premeditation, and even inaccurately stated that Dr. Axelrad had taken the contents of the letters as true when forming his opinion as to defendant's mental state. Dr. Axelrad quite clearly testified that he had no way of evaluating the truth of the allegations in the letters. For purposes of responding to cross-examination only he testified that if the letters were true, their allegations were consistent with his diagnosis that defendant suffered from a paranoid mental illness. The prosecutor's closing argument thus highlights the impossibility of the mental gymnastics that the limiting instructions asked the jury to perform.

## CONCLUSION

In conclusion we hold that the trial court prejudicially abused its discretion by permitting the hearsay declarations of defendant's wife accusing him of prior threats of violence against her and expressing her fears of future violence to be read into the record, by ruling that copies of the wife's letters would be available to the jury, and by permitting the prosecutor to refer to the letters repeatedly and to argue extensively that the letters should be considered for purposes for which the court had ruled they were inadmissible. (*People* v. *Hamilton, supra,* 55 Cal.2d 881; *People* v. *Ireland, supra,* 70 Cal.2d 522.) The limiting instructions given by the trial court were not adequate to insure that the letters would be used only for proper purposes both because of the inflammatory nature of the hearsay involved

and because the letters could effectively undermine the experts' opinions only if their allegations were true. The accusations of prior threats played such a central role in the prosecutor's theory of the case, it was unrealistic to expect the trier of fact not to consider the letters for the truth of their assertions. This potential improper use of the letters went to the heart of the defenses offered, and the error must therefore be considered prejudicial. (*People* v. *Ireland, supra,* 70 Cal.2d 522.)

The judgment is reversed.

Kaus, J., and Broussard, J., concurred.

**BIRD, C. J.,** Concurring.—Nearly six years ago, two members of this court expressed the view that an accused's state and federal constitutional rights to a jury drawn from a fair cross-section of the community are not abridged by the exclusion of resident aliens from the jury venire.[1] (*Rubio* v. *Superior Court* (1979) 24 Cal.3d 93, 99-105 [154 Cal.Rptr. 734, 593 P.2d 595] (lead opn. of Mosk, J.).) Justices Richardson and Clark concurred in the result in *Rubio,* but expressed no views on the merits of the cross-sectional issue. (*Id.,* at p. 105.) Three justices dissented on that issue. (*Id.,* at pp. 105-120.)

It is well established that "in the decision of a case before the court in Bank the concurrence of at least four justices is necessary, and . . . any proposition or principle stated in an opinion is not to be taken as the opinion of the court, unless it is agreed to by at least four of the justices." (*Del Mar Water, etc. Co.* v. *Eshleman* (1914) 167 Cal. 666, 682 [140 P. 591].) Thus, any language or opinion not concurred in by at least four justices of this court has "no controlling weight" and is of no precedential effect. (*People* v. *Ceballos* (1974) 12 Cal.3d 470, 483 [116 Cal.Rptr. 233, 526 P.2d 241]; see also *Scott* v. *Times-Mirror Co.* (1919) 181 Cal. 345, 359-360 [184 P. 672, 12 A.L.R. 1007]; *Smith* v. *Evans* (1974) 42 Cal.App.3d 154, 157 [116 Cal.Rptr. 684].)

Neither in *Rubio* nor in any other case has a majority of this court ever held that the exclusion of resident aliens from California juries satisfies the dictates of the state and federal Constitutions. The constitutionality of Code of Civil Procedure sections 198 and 199 is, therefore, before this court without any guidance from controlling precedent. No violation of the prin-

---

[1]Code of Civil Procedure sections 198 and 199 provide, inter alia, that a noncitizen is not competent to act as a juror.

ciples of stare decisis would occur were this court to entertain appellant's claim and decide that those statutes contravene the state Constitution.[2]

 Therefore, while I concur in the reversal of appellant's conviction on the ground that the trial court erred in admitting portions of his wife's letters into evidence, I would address the jury issue in this case, and hold that the exclusion of resident aliens from California juries violates the cross-section requirement of the state Constitution.

The rationale of the lead opinion in *Rubio* is not persuasive. Its central premise is that while resident aliens are a unified group who share a common perspective arising from their life experiences, they may constitutionally be excluded from jury service because another group in the community—naturalized citizens—adequately represents their perspective. (*Rubio, supra,* 24 Cal.3d at pp. 98-100 (lead opn. of Mosk, J.).) However, as Justice Tobriner's dissent points out, such logic would entirely undercut the cross-section requirement. For example, under that reasoning, the arbitrary exclusion of one portion of an identifiable group could be justified on the ground that the remaining portion represents its interests, and the exclusion of an entire minority group could be upheld on the basis that another is permitted to serve. Such a formulation would uphold "a statute providing for the exclusion of blacks whose last names begin with A through L, . . . since blacks with last names beginning with M through Z could adequately represent the viewpoints of the group of excluded blacks." (*Rubio, supra,* 24 Cal.3d at p. 106 (dis. opn. of Tobriner, J.).)

The principle of "vicarious" representation must not be viewed as a substitute for the cross-section requirement. That constitutional guarantee ensures that the venire reasonably reflect the relative proportions of all distinctive groups in the community. Resident aliens at least "rival naturalized citizens in numbers." (*Rubio, supra,* 24 Cal.3d at p. 100, fn. 8 (lead opn.), 109, fn. 12 (dis. opn. of Tobriner, J.).) Since resident aliens represent a significant proportion of the community, their exclusion on the "vicarious"

---

[2]As Justice Tobriner noted in his dissent in *Rubio*, "a number of federal cases have indicated that the exclusion of aliens from jury service does not violate the federal Constitution. (See *Foley* v. *Connelie* (1978) 435 U.S. 291 [55 L.Ed.2d 287, 98 S.Ct. 1067]; *Perkins* v. *Smith* (D.Md. 1974) 370 F.Supp. 134, affd., 426 U.S. 913 [49 L.Ed.2d 368, 96 S.Ct. 2616])," but that "those decisions are, of course, not controlling as to a defendant's right to an impartial jury under article I, section 16 of our state Constitution." (*Rubio* v. *Superior Court, supra,* 24 Cal.3d at p. 117, fn. 22 (dis. opn. of Tobriner, J.).)

representation theory constitutes a clear violation of the cross-section requirement.[3]

The *Rubio* lead opinion also sought to justify the exclusion of resident aliens on the basis that political decisionmaking must be restricted to members of a state's political community. (*Rubio, supra,* 24 Cal.3d at p. 104.) However, as Justice Tobriner convincingly pointed out, serving on a jury does not amount to political decisionmaking. The vote cast by a juror is fundamentally different than the vote cast by an elector. (*Id.,* at p. 115 (dis. opn.).) Since jurors decide questions of fact in individual disputes under the guiding instructions of the trial judge, their participation in the judicial process cannot be characterized as lawmaking in the legislative sense or policymaking in the executive sense. (*Id.,* pp. 115-116.)

Moreover, even assuming arguendo that jury service does "substantially affect the members of the political community" (*id.,* at p. 104 (lead opn. of Mosk, J.)), I think it appropriate to note that the state Constitution does not reflect that concern. The state charter contains no citizenship require-

---

[3]The assumption that differences between naturalized citizens and noncitizens are differences in degree but not in kind finds no basis in fact. In actuality, noncitizens differ significantly from naturalized citizens in racial, ethnic, and cultural characteristics. There has been a shift in the racial and ethnic composition of the immigrant groups due to the changing patterns of immigration and naturalization. Thus, the characteristics of immigrants who presently enjoy the status of naturalized citizens are quite different from those of immigrants who have not yet become citizens.

Consider the immigration statistics. Between 1931 and 1960, Europe provided 81 percent of the immigrant pool, while Latin America, excluding the Caribbean countries, provided only 15 percent. (Select Com. on Immigration and Refugee Policy, U.S. Imm. & the Nat. Interest: Final Rep., p. 95 (1981) [hereafter Final Report] (All percentages are computed from data reported in the cited reports).) Between 1961 and 1970, immigrants from Europe represented only 34 percent of the total immigrant pool, while the Latin American proportion increased to 25 percent. (U.S. Dept. Justice, Imm. & Nat. Service, INS Ann. Rep., table 13, p. 88 (1976) [hereafter 1976 Annual Report].) In 1979, due in part to the refugee flows, immigrants from Asia increased to 41 percent of the total pool, while immigrants from Europe diminished to 13 percent. Immigrants from Latin America diminished only slightly to 23 percent. (Final Report, *op. cit. supra,* at p. 95; U.S. Dept. Justice, Imm. & Nat. Service, INS Ann. Rep., table 1A, p. 2 (1979) [hereafter 1979 Annual Report].) Since at least five years' residence is required for naturalization, it appears that the present noncitizen pool is predominantly Asian and Latin American.

Next, examine the naturalization statistics. Resident aliens from Europe comprised 25 percent of all persons naturalized in 1979, while resident aliens from Latin America comprised only 14 percent. (1979 Annual Report, table 39, p. 88.) A comparison of immigration statistics with naturalization statistics for these areas also indicates that European immigrants naturalize in greater proportions than do their Latin American counterparts. (Compare 1976 Annual Report, table 14, p. 89 with 1979 Annual Report, table 39, p. 88.) Moreover, naturalization rates differ by country of origin. Naturalization rates for immigrants from Mexico is particularly low. For example, between 1972 and 1979, approximately 12 percent of persons who had immigrated from Mexico became citizens. (*Ibid.*) This figure is especially significant given that a large percentage of this state's resident aliens are from Mexico. Thus, it is manifest that exclusion of noncitizens adversely affects the proportion of Latin Americans, especially those of Mexican origin, on California juries.

ment for jury service, but only for voting (art. II, § 2) and for election to the Legislature (art. IV, § 2, subd. (c)) or the Governorship (art. V, § 2).

However, the state Constitution does guarantee the right to an impartial trial by jury. (Art. I, § 16.) This court has recognized that this right ensures that the venire will represent "a diversity of experience, knowledge, judgment, and viewpoints." (*Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 22 [168 Cal.Rptr. 128, 616 P.2d 1301].) Such diversity is necessary in our culturally pluralistic society in order to "recognize a fuller range of possible meanings or explanations for particular behavior . . . [¶] . . . [and to] insure that the common sense of the community is accurately expressed in applying [the reasonable doubt] standard to the facts." (*Id.*, at p. 24.) If the right to an impartial jury requires the widest diversity of possible views within the limits of the state Constitution, infringements on that right, founded upon no other specific state constitutional provision, are prohibited.

Since the California Constitution does not permit the exclusion of resident aliens from California juries, I would reverse the judgment on that additional ground.

Broussard, J., concurred.

**MOSK, J.**—I dissent.

While I agree with most of the rationale of the majority opinion, I am concerned with the effect of a reversal on the administration of justice.

These crimes were committed in early 1978, *seven years ago.* To require a retrial after this long passage of time casts an unfair burden on the memories of witnesses and on both the prosecution and defense.

Since there is no question of the responsibility of this defendant for three homicides and one assault, I would exercise the power this court has pursuant to Penal Code sections 1260 and 1181, subdivision 7, to modify and reduce the judgment from two counts of first degree murder, one count of second degree murder and one count of assault with intent to commit murder, to three counts of second degree murder and one count of assault with a deadly weapon, and to remand to the trial court for resentencing.

For a discussion of the authority of this court to reduce a judgment and sentence, see my separate opinion in *People* v. *Holt* (1984) 37 Cal.3d 436, 462 [208 Cal.Rptr. 547, 690 P.2d 1207].

The Chief Justice's proposed additional ground for reversal requires little comment. *Rubio* v. *Superior Court* (1979) 24 Cal.3d 93 [154 Cal.Rptr. 734,

593 P.2d 595], remains the prevailing law in California and it properly should be. The exclusion of ex-felons and aliens from participation in governmental functions has been consistently upheld by the United States Supreme Court. As Chief Justice Burger wrote for the court in *Foley* v. *Connelie* (1978) 435 U.S. 291, 295 [55 L.Ed.2d 287, 292, 98 S.Ct. 1067], to obliterate all the distinctions between citizens and aliens would " 'depreciate the historic values of citizenship.' " He explained (at p. 296 [55 L.Ed.2d at p. 292]), "This is not intended to denigrate the valuable contribution of aliens who benefit from our traditional hospitality. It is no more than recognition of the fact that a democratic society is ruled by its people. Thus, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions. See 413 U.S., at 647-649. Similar considerations support a legislative determination to exclude aliens from jury service. See *Perkins* v. *Smith,* 370 F.Supp. 134 (Md. 1974), aff'd, 426 U.S. 913 (1976). . . . This is not because our society seeks to reserve the better jobs to its members. Rather, it is because this country entrusts many of its most important policy responsibilities to these officers, the discretionary exercise of which can often more immediately affect the lives of citizens than even the ballot of a voter or the choice of a legislator. In sum, then, it represents the choice, and right, of the people to be governed by their citizen peers." A jury, of course, performs a vital governmental function.

As indicated above, I would modify the judgment, affirm as modified, and remand to the trial court for resentencing.

Teilh, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.