Filed 3/23/16  P. v. Aguirre CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B265469 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. KA104697) |
| ANDRES GARCIA AGUIRRE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Law Offices of Andy Miri and Andy Miri for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Andres Garcia Aguirre of first degree murder (Pen. Code, § 187, subd. (a)),[1] and found true the allegation that he personally used a knife in the commission of the crime (§ 12022, subd. (b)(1)).  The court sentenced him to a term of 26 years to life in state prison.  Defendant appeals from the judgment of conviction, contending:  (1) the trial court unduly restricted the testimony of the defense psychiatrist; (2) the evidence is insufficient to prove intent to kill and premeditation and deliberation; and (3) the evidence of "diminished actuality" requires reversal of the conviction.  We find no error and affirm.

## BACKGROUND

*Prosecution Evidence*

On February 12, 2014, around 2:45 a.m., the body of Joseph Chacon was discovered lying in a parking lot on Old Valley Boulevard in La Puente.  He had been stabbed five times, twice in the chest and three times in the back.  At the time of death, he had a blood alcohol level of 0.29 percent.  At trial, there was no dispute that defendant killed Joseph – in four separate interviews, defendant confessed to investigators, and the parties stipulated that defendant's DNA was a match to that of a blood stain at the scene of the crime.  The bulk of the prosecution's case rested on defendant's four confessions.

*First Confession*

Based on information from Joseph's family, Los Angeles County Sheriff's Sergeant Ken Perry identified defendant as the last person who had seen Joseph

---

[1]     Undesignated section references are to the Penal Code.

2

alive. On February 14, 2014, Sergeant Perry texted defendant and asked that he come to the station to talk about where he had dropped Joseph off before he was found dead. Defendant agreed and drove to the station with his boyfriend, Jonathan Rodriguez.

Defendant told Sergeant Perry that Joseph was a closet homosexual who often dressed as a woman and was considering taking hormone therapy to transition from male to female. Defendant said that he had picked Joseph up at his home and taken him to defendant's home. They talked about hormone therapy and dressing as women that night to take pictures of themselves and go out. During the course of the conversation, Joseph decided not to have hormone therapy, and said he did not want to dress up or take photographs. They left defendant's home and drove around drinking beer. Joseph became drunk and belligerent, and asked defendant to drop him off near La Puente High School because he was going to visit a friend. After dropping Joseph off, defendant felt bad and noticed that Joseph had left his cell phone and some other things in the car. Defendant drove around looking for Joseph, but was unable to find him. He went home, told his boyfriend Jonathan what happened, and went to bed. The next morning, he drove to Joseph's home and gave Joseph's cell phone and other property to Joseph's sister. When Joseph's sister expressed concern that Joseph had not returned home, defendant said that he would probably call soon. Defendant told Sergeant Perry that Joseph often hung out with a transgender person, Sasha, and that Sergeant Perry should find Sasha to investigate Joseph's death.

Defendant agreed to show Sergeant Perry and his partner, Detective Fred Reynolds, where he had dropped Joseph off. With defendant directing, Sergeant Perry drove to a location near La Puente High School, and then traced the route defendant said he had driven looking for Joseph. Sergeant Perry believed that the

3

specifics of defendant's supposed route of travel were not "adding up." He parked, and told defendant that he had "some issues" with his description. Defendant then said, "All right. I admit it. I killed him." He added that that he was "okay" with the killing "because he had overcome his guilt."

*Second Confession*

On the way back to the station, defendant added details of the killing. He said that he felt Joseph had been using him and was distant when they were together, texting and calling other friends, including a person named Mike. Defendant felt that Joseph perhaps wanted to hurt him or steal something. Describing the stabbing, defendant said that Joseph pulled a knife as they were parked in defendant's car and held it to defendant's neck. Defendant said that he got control of the knife and stabbed Joseph.

At the station, defendant's boyfriend Jonathan was present, and defendant asked if they could speak. Sergeant Perry agreed. In the detectives' presence, defendant said to Jonathan that he had told the detectives "everything." He added, gesturing toward Jonathan's chest, "Remember I told you how he put the knife to me like this[?]" Jonathan stepped back and asked, "What do you mean?"

*Third Confession*

The detectives took defendant to an interrogation room, where he waived his rights and agreed to talk further about the killing. The interrogation was recorded on a CD and played for the jury.[2]

---

[2]     The jury was also provided with a 52-page transcript of the interrogation. At times we quote from the transcript.

4

Under questioning, defendant said that he had known Joseph since 2006, but ended their relationship several years later after Joseph took $700 from him. In November 2013, after a chance encounter on a bus, they became reacquainted, but were not romantically involved. At no time was Joseph physically abusive to defendant. However, defendant felt that Joseph had changed, and was using him for money and transportation. Joseph talked frequently of taking hormones to transition, but never did. Joseph often called defendant a "diva" out of "malice" or "envy," because he did not understand that defendant was "not trying to look like a girl and get approval" from others, but rather only "approval for" himself. Defendant came to feel that Joseph claimed he wanted to transition like defendant did, but was instead "just pretending all along."

Defendant said that on the evening before the killing, he "was stoned" and had some difficulty remembering the precise sequence of events. He said that when he picked Joseph up at Joseph's home, he began to feel suspicious that Joseph was planning something, because Joseph's brother and sister did not make eye contact when defendant greeted them. Joseph's sister was talking on Joseph's phone in a low voice, and defendant thought she was talking about him.

Defendant drove with Joseph to defendant's home. At some point, defendant "just got crazy" and believed Joseph was "gonna do something," because he was "calling a bunch of people" to come over or arranging for Joseph and defendant to go meet them. At defendant's house, defendant suggested that they take pictures of themselves dressed as women. He was testing Joseph to see whether he wanted to transition with him. Defendant put on eye shadow and foundation, but Joseph did not want to take pictures.

They left Joseph's house in defendant's car, and drove around for a while to various locations. Joseph was on the phone making plans with other people.

5

Defendant then drove to the murder scene. He had never been there before. He hoped to "hang out" with Joseph, and determine whether he should continue their friendship. He also considered whether he should kill Joseph "[f]or the safety of [defendant's] family."

They drank beer for a while, and Joseph got out of the car to urinate. Defendant followed to "see how fake" he was. Joseph's friend Mike had been calling and texting Joseph. Joseph had told defendant that Mike was a gang member and "very aggressive." While they were standing there, Mike texted. Defendant asked Joseph, "[W]hat's up, man? . . . [W]hat's going on with . . . us? Like are we friends? . . . [J]ust lay off the phone." Joseph complied and became quiet.

Defendant had brought a knife from home in a tote bag "in case [Joseph] tried to bring Mike over or something." The knife was Japanese, similar to a short sword. Defendant carried the tote bag with him when he got out of the car, because it also had beer in it.

Joseph said, "Let's get out of here," and something else about Mike, then headed for the car. Defendant felt that Joseph's conduct proved Joseph was using him, "[a]nd . . . that's what mostly pissed [defendant] off." Defendant felt "[a]bandoned," "[b]etrayed," "[d]eceived [and] hurt." He pulled out the knife, cutting his own index finger in the process, and stabbed Joseph in the back while Joseph was walking away from him. Joseph said "you got me," which defendant took as a "confession" that Joseph intended to "do [him] wrong." Joseph fell, and defendant stabbed him in the chest. Joseph got up, ran a short distance, and fell again.

Although defendant did not know how many times he stabbed Joseph, he explained that he stabbed him "[s]everal times in the back for back-stabbing me.

6

And one for hurting me in the heart."  Afterward, defendant thought to himself that he should have told Joseph off.  Leaving Joseph lying face down, he "casually drove away" and buried the knife.  He later returned Joseph's items to his sister to "deflect" suspicion so that Joseph's family would not come after him or his family.  Defendant "got over the . . . guilt" because he felt killing Joseph "was the right thing to do."

Following the interrogation, defendant went with the detectives to retrieve the knife.  They found it buried near an electrical box in a vacant lot in the City of Walnut.

*Fourth Confession*

On February 15, 2014, after the knife was recovered, defendant accompanied the detectives in a walk through of the murder scene.  An audio-video DVD of the event was played for the jury.[3]

In the course of the walk through, defendant said that he carried the tote bag containing the knife when he got out of the car at the murder scene for protection, because he believed Joseph was planning something and might call Mike or his sisters.  Defendant said that when Joseph finished urinating, he demanded to leave, and defendant was "having a realization that . . . he [was] not my friend [but] someone who's out to hurt me and my family."  As Joseph walked away, defendant was "furious" and stabbed him in the back, and in the chest after he fell.

At the end of the walk through, defendant said:  "I didn't mean to do it.  I just felt like it was the right thing to do because I felt like he was being resourceful by calling his friends and planning something right under my nose.  And, I guess,

---

[3]     The jury was also provided with a 15-page transcript, from which we quote.

7

he thought me being oblivious.  And I'm not proud of what I did.  But, I – I had to do it."

*Defense*

The defense called three witnesses.  The first was defendant's mother, who testified that in 2007 defendant was assaulted by four people and "was not well in his head after that."  He did not "act right" and would "think[] like a child."  He never received any medical treatment.

The second witness was defendant's boyfriend, Jonathan.  He testified that defendant was upset and worried that Joseph was writing about him in his journal.  On many occasions, Jonathan questioned defendant's perception of reality, such as one occasion when defendant said that a stranger had intentionally coughed at them to start an argument, and on numerous other occasions when he stated that people in restaurants were putting something in his food.  Defendant also mentioned that he seen small, shadowy creatures that made him feel uneasy.

The final witness was Dr. Ronald Markman, a forensic psychiatrist who had examined defendant in two sessions for about four hours total.  As here relevant, Dr. Markman diagnosed defendant as having three psychiatric disorders.  First, he suffered from a "poly-substance abuse problem" caused by a long history of drug abuse – a condition that can cause someone to be suspicious of other people and question their motivation and attitude.  Defendant reported having used alcohol and methamphetamine on a regular basis.  Second, he diagnosed defendant has having "drug induced paranoid psychosis," which can cause "poor judgment."  Third, he believed that defendant suffered from "gender identity disorder."  He also noted that defendant reported that he had suffered a head injury in 2006

(though Dr. Markman found the injury to be irrelevant to his diagnoses ), and that he had been physically and sexually abused as an infant.

In response to hypothetical questions reciting some of the facts of defendant's background, Dr. Markman testified that a person of that background could form the intent to kill, but it was "somewhat questionable" whether he could deliberate and premeditate, and "would likely have lacked . . . the ability to deliberate."

On cross-examination, when asked to assume that before committing a killing, the killer considered whether he should remain friends with the victim, terminate the relationship, or kill him, Dr. Markman testified that such a person would have the ability to deliberate. Further, when asked to assume that the killer stabbed the victim at a secluded location, feeling abandoned and betrayed by the victim who had received a telephone call from another person, Dr. Markman testified that such a killer would be capable of deliberation.

## DISCUSSION

*Limiting Expert Testimony*

Defendant contends that the trial court erred in unreasonably restricting Dr. Markman's testimony. We disagree.

Before Dr. Markman testified, the prosecutor moved outside the jury's presence to prevent Dr. Markman from testifying to any statements defendant made to him that were not otherwise presented through admissible evidence at trial. As described by the prosecutor, those statements were inconsistent with defendant's confessions, and included defendant having told Dr. Markman that Joseph pinned defendant against the wall, kissed him, and "[felt] him up"; that defendant was "tipsy, drunk, stoned"; that Joseph said, "you owe me,

9

motherfucker"; that Joseph grabbed defendant's jacket and pulled him toward the car; that Joseph might have slipped something in defendant's drink that made defendant paranoid; and that defendant thought Joseph wanted to kill him to get something out of him.

The trial court ruled that although Dr. Markman could testify generally about what he considered in reaching his opinion, and could also testify concerning whether defendant formed the requisite mental state, he would not be permitted to testify to the specific statements defendant made to him describing the crime.

Immediately before Dr. Markman testified, the court held a hearing outside the jury's presence at which Dr. Markman was asked to describe the matters on which he based his opinion testimony. Dr Markman testified that he considered the police reports, the preliminary hearing transcript, and his two interviews with defendant. The court ruled that Dr. Markman could refer generally to those matters, but not to defendant's specific statements in the interviews.

Defendant contends that the trial court's ruling improperly prevented the jury from hearing defendant's description of the crime, as well as his description of his upbringing and background. He is mistaken.

"'While an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible. [Citations.] The rule rests on the rationale that while an expert may give reasons on direct examination for his opinions, including the matters he considered in forming them, he may not under the guise of reasons bring before the jury incompetent hearsay evidence." (*People v. Coleman* (1985) 38 Cal.3d 69, 92, overruled on another point in *People v. Riccardi* (2012) 54 Cal.4th 758, 824, fn. 32.) "A trial court . . . 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of

10

incompetent hearsay.' [Citation.] A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' [Citation.] This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact. [Citations.]" (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.)

Here, defendant's description of the crime and of his background to Dr. Markman was not independently admissible as proof of the facts he stated. Because defendant did not testify, there was no other admissible evidence from which the jury could find defendant's statements to be true. Thus, the trial court was well within its discretion in excluding Dr. Markman from referring to defendant's statements.

Defendant's reliance on *People v. Cortes* (2011) 192 Cal.App.4th 873 is misplaced. There, the defendant testified at trial about his childhood upbringing, his prior trauma, and his version of the killing. Despite that evidence, the trial court precluded the defense expert from referring to defendant's discussion of those topics during the expert's interview. In that context, the court of appeal held in part that the defense expert "should have been permitted to testify about defendant's upbringing and traumatic experiences as a child and/or adolescent, inasmuch as defendant's prior traumatic experiences informed [the expert's] opinion, and explained the connection between defendant's diagnoses, his mental state and his behavior." (*Id.* at p. 910.) The court also held that the expert "should have been permitted to explain the bases for his opinions, including defendant's statements describing his perception of the stabbing." (*Ibid.*)

11

By contrast, as we have noted, in the present case defendant did not testify, and Dr. Markman's testimony relating defendant's out-of-court statements to him would have been the only evidence describing defendant's newest version of events and his upbringing. Thus, *Cortes* is distinguishable.

*Sufficiency of the Evidence*

Defendant contends that the evidence is insufficient to support his conviction of first degree murder, because it failed to prove premeditation and deliberation.[4] He asserts that he acted either in self-defense or in unreasonable self-defense. He also asserts that considering his four confessions in light of Dr. Markman's testimony, the evidence failed to prove he had the intent to kill.

The contention, in all its particulars, is meritless. Of course, on appeal, we view the entire record in the light most favorable to the judgment, and draw all inferences in support it. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

We have already summarized in detail each of defendant's four confessions. We have also summarized in detail Dr. Markman's testimony. Suffice it to say that the confessions contain a wealth of evidence establishing that defendant, feeling betrayed and used by Joseph, stabbed him to death, having formed the intent to kill before the killing, and having deliberated on that intent. Indeed, in his third confession, defendant's own words perhaps best described his mental state.

---

[4] Using the pattern CALCRIM instructions the jury was instructed on first degree murder on theories of premeditation and lying in wait (CALCRIM No. 521), second degree murder (CALCRIM No. 520), self defense and defense of others (CALCRIM No. 505), and voluntary manslaughter on theories of provocation and unreasonable self-defense (CALCRIM Nos. 570 and 571). The jury returned a verdict of first degree murder, without specifying the theory. Because the evidence supports the conviction on a premeditation theory, and because defendant does not mention lying in wait, we do not discuss the latter theory.

He explained that he intended to kill Joseph because he felt "[a]bandoned," "[b]etrayed," "[d]eceived [and] hurt." He stabbed Joseph "[s]everal times in the back for back-stabbing me. And one for hurting me in the heart." Such a mental state is quintessential premeditation and deliberation.

To the extent Dr. Markman's testimony suggested defendant lacked the ability to deliberate, and to the extent his testimony and other evidence raised an issue whether defendant acted in actual or unreasonable self-defense, those were questions for the jury to resolve, and the evidence overwhelmingly supports its verdict. Even Dr. Markman, confronted with specific hypothetical facts similar to the events described in defendant's confessions, testified such facts described a killer with the ability to deliberate. In short, we find no basis on which to conclude that the evidence was insufficient to support the conviction of first degree murder.

*Diminished Actuality*

In a related contention, defendant contends that his "diminished actuality" prevented him from forming the intent to kill. The contention ignores the record.

Section 28 provides that evidence of mental disorders is admissible "'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged,' a theory sometimes referred to as 'diminished actuality.' [Citation.] Section 28(a) bars evidence of the defendant's *capacity* to form a required mental state, consistent with the abolition of the diminished capacity defense." (*People v. Elmore* (2014) 59 Cal.4th 121, 139, original italics.) The jury was instructed on this theory using CALCRIM No. 3428.

Here, as we have already discussed, defendant's own description of his mental state established that he formed a premeditated, deliberate intent to kill. On

13

appeal, defendant simply avoids the obvious by not discussing the evidence. His contention that "diminished actuality" precluded a conviction of first degree murder is unsupportable.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:



MANELLA, J.



COLLINS, J.

14